Caroline Bush EMENY et al.

v.

The UNITED STATES.

No. 317–66.

United States Court of Claims.

Dec. 17, 1975.

Richard A. Baenen, Washington, D. C., attorney of record, for plaintiffs; Thomas E. Wilson and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Hubert M. Crean, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant; Floyd L. France, Washington, D. C., of counsel.

Before DURFEE, Senior Judge, and SKELTON and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on exceptions by the parties to the recommended decision filed April 17, 1975, by Senior Trial Judge Mastin G. White pursuant to Rule 134(h), having been submitted and considered on the briefs and oral argument of counsel. Since the court agrees with the recommended decision, as hereinafter set forth [*], it hereby affirms and adopts the same as the basis for its judgment in this case. It is therefore concluded as a matter of law that the following plaintiffs are entitled to recover $341,346.60 as reimbursement for reasonable costs, disbursements and expenses (including reasonable attorney, appraisal and engineering fees, actually incurred because of this proceeding, but not for such costs, disbursements and expenses incurred after April 17, 1975), in addition to recovering under the court's order of October 26, 1973, as amended by the order of November 2, 1973, the sum of $221,880, plus an amount computed at the rate of 4 percent per annum on $221,880 from January 5, 1963, to the time of payment, as just compensation for the taking of their property; and judgment is entered for them against the defendant in the total sum of $563,-226.60, plus an amount computed at the rate of 4 percent per annum on $221,880 from January 5, 1963 to the time of payment:

Caroline Bush Emeny, Individually and as Trustee,

Francis T. O'Brien, Trustee
Frederick L. Emeny, Trustee
Elizabeth Claire Bivins Childers, Trustee,
First National Bank of Amarillo, Trustee,
Iris F. Prescott,
Estelle F. Marsh, Executrix of the Estate of Stanley Marsh, Jr.,
Tom F. Marsh,
Stanley Marsh, III,
Michael C. Marsh,
Mary Taggart Emeny, Trustee,
Gwendolyn O'Brien Marsh, Trustee,
Caroline O'Brien Sobieski, Trustee, and
Caroline Emeny Wagley, Trustee.

## OPINION OF TRIAL JUDGE

WHITE, *Senior Trial Judge*: This is the concluding phase of a controversy which has involved complex issues of fact and law, has extended over a prolonged period of time, and has been quite expensive for all concerned.[1] The purpose of the present undertaking is to determine the plaintiffs' allowable litigation expenses under the provisions of 42 U.S.C. § 4654(c).

Section 4654(c) provides in pertinent part as follows:

(c) The court rendering a judgment for the plaintiff in a proceeding brought under section * * * 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, * * * shall determine and award * * * to such plaintiff, as a part of such judgment * * *, such sum as will in the opinion of the court * * * reimburse such plaintiff for his *reasonable* costs, disbursements, and expenses, including *reasonable* attorney, appraisal, and engineering fees, actually incurred *because of such proceeding*. [Emphasis supplied.]

---

[*] Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed April 17, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The plaintiffs' expenses are summarized in the findings of fact. Although the record does not contain any specific data on the expenses incurred by the Government in connection with the controversy, the total of such expenses would undoubtedly be a large amount.

The several plaintiffs are the owners of 23 contiguous tracts of land which contain a total of 13,867.5 acres and are situated in Potter County, Texas. These 23 tracts of land overlie a large subterranean geological structure, or underground dome, commonly known as the Bush Dome.

In its natural state, the Bush Dome contained a valuable deposit of natural gas having an unusually high helium content. Many years ago, the defendant—represented by the Helium Activity of the Bureau of Mines, Department of the Interior—acquired from the plaintiffs (or their predecessors in interest) the ownership of the native gas deposit in the Bush Dome. During the intervening years, the defendant has removed billions of cubic feet of the helium-rich natural gas from the Bush Dome and, in the national interest, has extracted the helium from the other constituents of the natural gas before disposing of the residue for commercial purposes.

The controversy out of which this litigated case arose had its origin on January 5, 1963, when the Helium Activity began to inject foreign crude helium (i. e., crude helium extracted from natural gas produced elsewhere) into the Bush Dome. Both the plaintiffs and the defendant claimed the ownership of the gas storage capacity in the Bush Dome that had been made available as a result of the defendant's previous actions in removing native natural gas from the Bush Dome as part of the national program for the production of helium.

As the plaintiffs and the defendant were unable to resolve their disagreement through negotiations, the plaintiffs instituted an action in this court on August 30, 1966, by filing a petition under the provisions of section 1491 of Title 28, United States Code.

In a decision dated July 16, 1969 (412 F.2d 1319, 188 Ct.Cl. 1024), the court held that the right to use the Bush Dome for the storage of helium produced elsewhere was vested in the plaintiffs, and not in the defendant. Further steps were then taken to determine the value of the property rights which the defendant had taken from the plaintiffs; and on October 26, 1973, the court entered an order declaring that the plaintiffs were entitled to recover the sum of $221,880, plus an amount computed at the rate of 4 percent per annum on $221,880 from January 5, 1963, to the time of payment, as just compensation for the taking by the defendant of the gas storage right in the Bush Dome and the incidental right to use so much of the surface of the lands containing the Bush Dome as may be reasonably necessary in the operation of a gas storage reservoir for foreign gas. The award included $208,012.50 for the taking of the gas storage right and $13,867.50 for the taking of the incidental right in the surface of the plaintiffs' lands.

Thereafter, on motion of the plaintiffs, the court remanded the case to the trial judge on January 4, 1974, for a determination to be made concerning "the amount of the reasonable attorney, appraisal, and engineering fees actually incurred by plaintiffs because of the proceedings in this case, pursuant to 42 U.S.C. § 4654(c)."[2] A trial for the reception of evidence on the subject matter of the remand was held; and the parties subsequently utilized the customary post-trial procedures by filing requested findings of fact and briefs.

### Pre-Litigation Expenses

■ A considerable period elapsed between the time when the defendant began to inject foreign crude helium into the Bush Dome on January 5, 1963 and the time in 1966 when the plaintiffs concluded that their controversy with the defendant over the right to store gas in the Bush Dome would have to be litigated by the institution of an action in the

2. The remand order also directed the trial judge "to determine and list the names of plaintiffs who are entitled to recover." This list is set out in finding 1.

Court of Claims under 28 U.S.C. § 1491. During the intervening period, the plaintiffs, at considerable expense, sought and obtained advice and assistance from several prominent law firms located in Amarillo, Texas, in Austin, Texas, in Cleveland, Ohio, and in Washington, D.C., and from prominent petroleum engineering firms located in Amarillo, Texas, in Dallas, Texas, and in Tulsa, Oklahoma. The plaintiffs were endeavoring during this period to ascertain the nature and extent of their property right in the gas storage capacity of the Bush Dome, and to obtain from the Government, through negotiations, a recognition of such right.

One of the questions to be decided at the present time is whether the plaintiffs are entitled to reimbursement under 42 U.S.C. § 4654(c) for the pre-litigation expenses, amounting to $40,826.62. The plaintiffs, quite naturally, argue that this question should be answered in the affirmative, while the defendant—not unexpectedly—contends that a negative answer to the question is required.

It is my conclusion that the plain language of 42 U.S.C. § 4654(c) precludes the court from including in its award to the plaintiffs any reimbursement for expenses incurred by the plaintiffs before they decided to file suit in the Court of Claims under 28 U.S.C. § 1491.

It will be recalled that the governing statutory provision, previously quoted in this opinion, authorizes reimbursement for those expenses—and only for those expenses—incurred "because of such proceeding"; and, under the ordinary rules of syntax, the quoted phrase obviously refers back to "a proceeding *brought under section * * * 1491 of Title 28 * * * for the taking of property by a Federal agency*" (emphasis supplied). The plaintiffs' expenses in connection with this controversy during the time when the plaintiffs were endeavoring to ascertain the nature and extent of their property right in the gas storage capacity of the Bush Dome, and trying to obtain a recognition of such right from the Government through negotiations, cer-

tainly were not incurred by the plaintiffs "because of" the proceeding which they subsequently instituted in this court under 28 U.S.C. § 1491 after the failure of the negotiations with the Government.

Thus, an allowance of the plaintiffs' pre-litigation expenses would require an amendment of the governing statutory provision, and this is beyond the power of the court.

### Litigation Expenses

The period of the litigation in this case was quite lengthy, extending over more than 8 years, and the plaintiffs' expenses during such period in connection with the case were impressively large, totaling $376,583.68.

It is established by the record that these expenses were "actually incurred" by the plaintiffs, and that they were incurred "because of" the proceeding under 28 U.S.C. § 1491. The parties are in dispute, however, over the question of whether all of these litigation expenses are properly allowable under the governing statutory provision.

It will be recalled that 42 U.S.C. § 4654(c) authorizes reimbursement only for "reasonable" expenses that are "actually incurred because of" a proceeding brought under 28 U.S.C. § 1491 for the taking of property by a federal agency. The defendant takes the position in the present case that not all of the plaintiffs' actual expenses in connection with this litigation can properly be regarded as "reasonable" charges against the Government under the pertinent statutory provision. The defendant particularly emphasizes in this respect the plaintiffs' tendency to engage duplicate sets of lawyers, and also the disproportionate relationship (in the defendant's view) between the amount of the plaintiffs' litigation expenses ($376,583.68) and the value ($221,880, as determined by the court) of the property rights which the defendant had taken and for which the plaintiffs were endeavoring to obtain just compensation in the litigation.

Duplicate sets of lawyers were retained and paid by the plaintiffs throughout most of the litigation period. From the inception of the litigation in 1966 until January 18, 1969, the plaintiffs' principal attorney was Will Wilson, of Austin, Texas, and associated with him was Joe A. Osborn, also of Austin, Texas. Messrs. Wilson and Osborn were prominent Texas lawyers. Mr. Wilson had served as the Attorney General of Texas and as an Associate Justice of the Supreme Court of Texas. Mr. Osborn had served as an Assistant Attorney General of Texas, in the Lands Division of the Attorney General's Office. Mr. Wilson withdrew from the case on January 18, 1969, in order to accept a federal appointment as an Assistant Attorney General in the U.S. Department of Justice. He was succeeded as the plaintiffs' principal attorney by another prominent Texas lawyer, Gaynor Kendall, who had previously served as an Assistant Attorney General of Texas, as a Visiting Professor of Law at the University of Texas Law School, and as a member of the Board of Directors of the Texas Bar Association. Mr. Osborn was associated with, and assisted, Mr. Kendall in the conduct of the litigation. Mr. Kendall's role as the plaintiffs' principal attorney continued until October 1969. First Mr. Wilson and then Mr. Kendall, with the assistance of Mr. Osborn, handled the case in a highly competent manner and were successful in persuading the court (412 F.2d 1319, 188 Ct.Cl. 1024) that the plaintiffs, and not the defendant, had the right to use the Bush Dome for the storage of helium produced elsewhere.

Notwithstanding the prominence and competency of Messrs. Wilson, Kendall, and Osborn, the plaintiffs deemed it advisable to retain the services of the outstanding Cleveland, Ohio, law firm of Jones, Day, Cockley & Reavis, and of that firm's Washington, D.C., branch operating under the name of Reavis, Pogue, Neal & Rose, for the purpose of rendering assistance in connection with the litigation. Such assistance consisted principally of reviewing and commenting upon papers prepared by Messrs. Wilson and Osborn, or Messrs. Kendall and Osborn, for filing with the court. For such services, the plaintiffs paid Jones, Day, Cockley & Reavis, and its Washington branch, a total of $27,818.73, while paying the principal attorneys, Messrs. Wilson, Kendall, and Osborn, a total of $39,586.41 over the same period of time.

In October 1969, after the court had decided the issue of liability in favor of the plaintiffs, Conan Cantwell, a member of the prestigious Dallas, Texas, law firm of Jackson, Walker, Winstead, Cantwell & Miller, became the plaintiffs' principal attorney in the proceedings for the determination of the value of the property rights taken by the defendant. Mr. Cantwell had previously distinguished himself in the field of real property and oil and gas law, and was Chairman of the Oil and Gas Institute of the Southwestern Legal Foundation. In the conduct of this litigation, Mr. Cantwell was assisted by other members of his firm, particularly A. W. Walker, Jr., the firm's most senior partner, and Jack Pew, Jr. Mr. Walker was a former Professor of Law at the University of Texas and a former President of the Texas Petroleum Council. Mr. Cantwell, with the assistance of other members of his firm, handled the case for the plaintiffs with great thoroughness and skill throughout the proceedings for the determination of the value of the property rights taken by the defendant.

In June 1971, while Conan Cantwell was in charge of the case for the plaintiffs, the latter retained the prominent Washington, D.C., law firm of Wilkinson, Cragun & Barker to render assistance to Mr. Cantwell and his firm in the valuation proceedings. Such assistance consisted principally of reviewing papers prepared by Mr. Cantwell and his firm for filing with the court. For such services, the plaintiffs paid Wilkinson, Cragun & Barker the sum of $7,418.35, while paying the principal attorneys, Jackson, Walker, Winstead, Cantwell & Miller, a total of $155,350.21.

The plaintiffs' tendency to retain the services of a duplicate set of attorneys, while being represented by another highly competent set of attorneys as principal counsel, was apparently due to the plaintiffs' rather extravagant idea of the value of the property rights taken by the defendant—the plaintiffs asked for a judgment in the amount of $2,330,911 for the property rights, not including any litigation expenses—and the plaintiffs' determination that every possible effort would be made, first, to have the validity of their claim recognized and, second, to have their exaggerated idea of value accepted.

The plaintiffs' generous strategy with respect to the engagement of attorneys may have been reasonable from their standpoint, in view of the objectives which they were seeking to achieve. On the other hand, when the matter is considered from the standpoint of requiring the defendant to reimburse the plaintiffs for litigation expenses, the conclusion is inescapable that there was a superabundance of attorneys involved in the proceedings on the plaintiffs' side. For the purposes of 42 U.S.C. § 4654(c), it does not seem "reasonable" to require the defendant (i. e., the taxpayers of the country) to defray the cost of the plaintiffs' strategy in having one set of experienced, competent, and highly paid attorneys review the work of another set of experienced, competent, and highly paid attorneys.

It is my opinion, therefore, that the expense items of $27,818.73 and $7,418.35 for attorneys' fees paid to reviewing counsel are not allowable under 42 U.S.C. § 4654(c).

█ With the $27,818.73 and the $7,418.35 items eliminated, there still remains in the claim the impressive figure of $341,346.60, representing litigation expenses incurred by the plaintiffs because of the litigation over the Bush Dome. The remaining figure is, of course, much larger than the value ($221,880, as determined by the court) of the property rights over which the plaintiffs were litigating with the defendant.

This proceeding—to determine, first, whether the plaintiffs or the defendant owned the gas storage capacity in the Bush Dome, and, second, to determine the value of the property rights in question—has involved extraordinarily complicated legal and technical issues. Throughout the proceeding, the defendant has sought, with great skill on the part of its exceedingly able counsel and technical experts, to establish the proposition that the plaintiffs were not entitled to recover anything in the litigation, either because the defendant owned the gas storage capacity in the Bush Dome or because such capacity, if owned by the plaintiffs, was unusable by the plaintiffs as a practical matter, and was therefore worthless, by virtue of the defendant's ownership of the native gas remaining in the Bush Dome.

In view of the unusual complications that have been involved in the litigation, and the defendant's adamant position as mentioned in the preceding paragraph, the plaintiffs were certainly entitled—and, indeed, were required as a practical matter—to utilize the services of experienced, highly skilled, and, therefore, expensive attorneys and technical experts. There is nothing in the record to indicate that the attorneys in charge of the case for the plaintiffs, or the technical experts involved in the case on the plaintiffs' side, charged the plaintiffs for any supposed work not actually performed, or that they did any work not reasonably required because of the complexities of the case, or that they charged the plaintiffs any larger fees than they would have charged other clients for the same amounts of work.

Accordingly, it is my opinion that, under the unusually complicated circumstances of this case, the expenses amounting to $341,346.60, actually incurred by the plaintiffs because of the proceeding under 28 U.S.C. § 1491, should be regarded as "reasonable" and allowable for the purposes of 42 U.S.C. § 4654(c).

█ The figure of $341,346.60, representing the plaintiffs' allowable litiga-

tion expenses, includes amounts totaling $69,240.15 expended by the plaintiffs in establishing their entitlement to recover litigation expenses and the amount of such expenses. These expenditures were made after the court had rendered the decision of July 16, 1969, in favor of the plaintiffs on the question of the ownership of the gas storage capacity in the Bush Dome and the decision of October 26, 1973, on the value of the property rights taken by the defendant. Nevertheless, the plaintiffs' post-decisional expenditures to establish their right to recover litigation expenses and the amount thereof were made "because of" the proceeding brought under 28 U.S.C. § 1491 for the taking of their property by the defendant. Consequently, reimbursement for such expenditures as a part of the judgment rendered in the proceeding is authorized by the language of 42 U.S.C. § 4654(c).

When the allowable litigation expenses in the amount of $341,346.60 are added to the sum of $221,880 previously determined by the court to be the value of the property rights taken by the defendant, it appears that the plaintiffs' judgment should be in the total amount of $563,226.60.

CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs Caroline Bush Emeny, Individually and as Trustee, Francis T. O'Brien, Trustee, Frederick L. Emeny, Trustee, Elizabeth Claire Bivins Childers, Trustee, First National Bank of Amarillo, Trustee, Iris F. Prescott, Estelle F. Marsh, Executrix of the Estate of Stanley Marsh, Jr., Tom F. Marsh, Stanley Marsh, III, Michael C. Marsh, Mary Taggart Emeny, Trustee, Gwendolyn O'Brien Marsh, Trustee, Caroline O'Brien Sobieski, Trustee, and Caroline Emeny Wagley, Trustee, are entitled to recover $341,346.60 as reimbursement for reasonable costs, disbursements, and expenses, including reasonable attorney,

appraisal, and engineering fees, actually incurred because of this proceeding up to April 17, 1975, in addition to recovering, under the court's order of October 26, 1973, as amended by the order of November 2, 1973, the sum of $221,880, plus an amount computed at the rate of 4 percent per annum on $221,880 from January 5, 1963, to the time of payment, as just compensation for the taking of their property. Plaintiffs are not entitled to recover for such costs, disbursements, and expenses incurred after April 17, 1975. It is therefore adjudged and ordered that the said plaintiffs recover of and from the United States the total sum of five hundred sixty-three thousand two hundred twenty-six dollars and sixty cents ($563,226.60), plus an amount computed at the rate of 4 percent per annum on $221,880 from January 5, 1963, to the time of payment.