**Andrew H. & Elizabeth H. YANCEY, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 413–85C.**

United States Claims Court.

July 10, 1986.

Thomas H. Yancey, Arlington, Va., for plaintiffs.

John S. Groat, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, of counsel.

## OPINION ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

This suit is brought by plaintiffs Andrew H. and Elizabeth H. Yancey to recover compensation for turkey breeder stock that was sold for slaughter as a result of a quarantine imposed by the United States Department of Agriculture (USDA) to control and eradicate an outbreak of lethal avian influenza in 1983–84. Plaintiffs allege a taking of their property without compensation, in violation of the Fifth Amendment to the Constitution, because the quarantine prevented the interstate sale of their stock and thereby destroyed its economic value. They also allege that defendant violated 21 U.S.C. § 114a and 21 U.S.C. § 134a by denying them compensation for the value of the flock.

Defendant moves over plaintiffs' opposition for summary judgment on the statutory claim only.

*Statement of Facts*

Plaintiffs were engaged in the business of producing and selling turkey hatching eggs and the poults hatched therefrom on their farms in Rockingham County, Virginia. On or about November 1, 1983, plaintiffs acquired a flock of 3,000 turkey breeder hens and 295 turkey toms for purposes

of selling the turkey hatching eggs produced to customers outside Virginia. Plaintiffs paid $31,684 for this stock.

In mid-October of 1983, four flocks of poultry in Lancaster County, Pennsylvania suffered substantial mortality, and an almost complete cessation of egg production, as the result of an outbreak of pathogenic avian influenza, a highly contagious viral disease of poultry. In its nonpathogenic or mild form, avian influenza causes little death loss and a small drop in egg production. In its pathogenic form, mortality and egg loss rates are substantially higher; the Lancaster outbreak resulted in greater than 90 percent mortality. The mild form can change to the more virulent form.

In response to the Pennsylvania outbreak, on November 8, 1983, the USDA promulgated regulations, 9 C.F.R. § 81, pursuant to its authority to regulate the interstate movement of diseased or exposed animals and to prevent the interstate spread of communicable disease.[1] The regulations quarantined certain areas in Pennsylvania, prohibited the interstate movement of live poultry infected with or exposed to pathogenic avian influenza, and carcasses, manure and litter of such poultry from such areas, and restricted interstate movement of certain articles, such as eggs and materials exposed to the disease. 48 Fed. Reg. 51422–51423.

On November 14, 1983, pursuant to 21 U.S.C. § 134a(b), the USDA declared an "extraordinary emergency" in the State of Pennsylvania, finding (48 Fed. Reg. 51798):

> Highly pathogenic avian influenza is a dangerous communicable disease of poultry and it is determined that an extraordinary emergency exists because of outbreaks of the disease in Pennsylvania, and that such outbreaks threaten the poultry of the United States, constitute a real danger to the national economy, and seriously burden interstate and foreign commerce.

The Secretary of Agriculture also determined that the State of Pennsylvania could not adequately control such outbreaks, and federal involvement was required. Under § 134a(b), that declaration empowered the Secretary to seize, quarantine and dispose of any animals which he found to be or to have been infected or exposed to the disease, and to pay fair market value compensation for animals destroyed. The emergency was extended to New Jersey on November 28, 1983. 48 Fed. Reg. 53678.[2]

Outbreaks of nonpathogenic avian influenza in Maryland and Virginia were traced to the Pennsylvania outbreak. Concerned that these cases might convert to the pathogenic form, USDA amended 9 C.F.R. § 81 to cover all forms of the avian influenza virus under the name "Lethal Avian Influenza." 49 Fed.Reg. 3839–3845 (Jan. 31, 1984). These regulations added specified counties in Maryland and Virginia (including Rockingham County, Virginia) to the list of identified quarantine areas. However, because the outbreaks were in mild form, and because the USDA determined that the Commonwealth of Virginia and the State of Maryland were taking adequate measures to control and eradicate the disease, no extraordinary emergency was declared in either Maryland or Virginia. *Id.*

The quarantine applicable to plaintiffs prohibited interstate shipment of live poultry, manure from poultry, and litter used by poultry and restricted interstate movement of carcasses, eggs and certain equipment. Permits were necessary to move restricted articles, and certain disinfection procedures were necessary to receive such permits. 49 Fed. Reg. 3843.

Pursuant to 21 U.S.C. § 114a, the USDA published regulations applicable to areas not under the declaration of an emergency, authorizing payment of up to 100 percent of the "expenses of purchase, destruction

---

1. The pertinent provisions are 21 U.S.C. §§ 111–113, 114a–1, 115–117, 119–126, 130, 134a–134f.

2. On December 12, 1983, because of the nature of the emergency, the USDA eliminated the "re-

stricted article" category, resulting in complete prohibition of interstate movement of all articles from these areas. 48 Fed. Reg. 55402–55403.

and disposition of animals and materials required to be destroyed because of being contaminated by or exposed to lethal avian influenza." 49 Fed.Reg. 3446–3448, amending 9 C.F.R. § 53.2(b).

The quarantine in Virginia remained in effect until September 14, 1984, when USDA determined that the disease had been eradicated. 49 Fed.Reg. 36630–36631.

Plaintiffs cooperated with the quarantine. Their flock underwent testing and surveillance by state and federal laboratories. Although these tests revealed no evidence of avian influenza, defendant did not permit plaintiffs to ship their turkeys or hatching eggs interstate during the quarantine. Unable to find a market for either the breeder stock or its eggs in Virginia, plaintiffs requested assistance from the Commissioner of Agriculture of Virginia to locate a market. That search proved unsuccessful.

In this period, plaintiffs were spending up to $1,800 weekly to maintain the flock. Plaintiffs decided that keeping the flock alive was uneconomic in the face of a quarantine of indefinite duration. They decided to sell the stock for meat, although the turkeys had not been "raised to be economically viable" for that purpose. The stock was sold for slaughter on February 13, 1984 for $20,887.

Plaintiffs submitted a claim to the Animal and Plant Health Inspection Service (APHIS) of USDA, pursuant to 21 U.S.C. § 114a and 9 C.F.R. § 53.2(b), as amended, for indemnity payments for the destruction of plaintiffs' turkeys. If eligible, plaintiffs would receive $63,556 for the stock slaughtered. APHIS denied payment on the ground that pathological tests performed on plaintiffs' stock revealed it to be healthy.

Plaintiffs filed suit in this court. They allege a taking of their property without compensation because the quarantine destroyed the economic value of their turkeys by eliminating all markets for their sale and forcing them to sell the turkeys for meat at a significant loss. They also allege that the denial of compensation for the slaughter of their turkeys violated several statutes providing that farmers be paid for the destruction of diseased and exposed livestock and poultry. Included in the claimed amount is compensation for the lost use of plaintiffs' "specially designed facilities and equipment" for the care of the turkeys and eggs, valued at $20,000.

Defendant moves for summary judgment on the statutory claim only. It argues that plaintiffs are not entitled to payment under the relevant statutes because their stock was healthy and thus it was not "required to be destroyed" and the USDA in fact never ordered its destruction.

### Discussion

The basis of plaintiffs' claim is that defendant was obligated by statute to pay for the destruction of the turkeys, and its refusal to do so was arbitrary and capricious. Plaintiffs rely on 21 U.S.C. § 114a and § 134a as the appropriate basis of their claim. They argue that the court must evaluate whether defendant's conduct was reasonably in accord with the statute.

Section 134a of Title 21 of the United States Code provides, in pertinent part:

(a) The Secretary, whenever he deems it necessary in order to guard against the introduction or dissemination of a communicable disease of livestock or poultry, may seize, quarantine, and dispose of, in a reasonable manner taking into consideration the nature of the disease and the necessity of such action to protect the livestock or poultry of the United States: (1) any animals which he finds are moving or are being handled or have moved or have been handled in interstate or foreign commerce contrary to any law or regulation administered by him for the prevention of the introduction or dissemination of any communicable disease of livestock or poultry; (2) any animals which he finds are moving into the United States, or interstate, and are affected with or have been exposed to any communicable disease dangerous to livestock or poultry; and (3) any animals which he

finds have moved into the United States, or interstate, and at the time of such movement were so affected or exposed.

(b) * * * [W]henever the Secretary determines that an extraordinary emergency exists because of the outbreak of such a disease anywhere in the United States, and that such outbreak threatens the livestock or poultry of the United States, he may seize, quarantine, and dispose of, in such manner as he deems necessary or appropriate, any animals in the United States which he finds are or have been affected with or exposed to any such disease and the carcasses of any such animals and products and articles which he finds were so related to such animals as to be likely to be a means of disseminating any such disease: *Provided,* That action shall be taken under this subsection only if the Secretary finds that adequate measures are not being taken by the State or other jurisdiction * * *.

\* \* \* \* \* \*

(d) * * * [T]he Secretary shall compensate the owner of any animal, carcass, product or article destroyed pursuant to this section. Such compensation shall be based upon the fair market value as determined by the Secretary, or any such animal, carcass, product, or article at the time of the destruction thereof. * * *

■ Section 134a(d) only requires compensation for animals or products "destroyed pursuant to this section." Thus, the provisions of § 134a(a) or § 134a(b) must first apply. *See Loftin v. United States,* 6 Cl.Ct. 596, *aff'd on opinion of trial court,* 765 F.2d 1117 (Fed.Cir.1984).

Section 134a(a) is inapplicable because plaintiffs' animals were not yet moving or moved in interstate commerce. In addition, plaintiffs' turkeys were not "affected or exposed" to the disease. Plaintiffs submit affidavits which state that their stock was healthy; therefore they could not be "affected". The regulations define "exposed" as (9 C.F.R. § 81.1):

Poultry which, through movement of poultry, individuals, feed, or other vectors has been determined by a Federal or State inspector to have had contact, directly or indirectly, with lethal avian influenza.

Plaintiffs' stock was never so determined and the necessary inference of this regulatory definition is that mere presence in a quarantine area does not suffice to "expose" plaintiffs' birds.

Moreover, § 134a(d) requires compensation only for animals which were destroyed and disposed of as provided in § 134a. Plaintiffs' turkeys were not destroyed by the Secretary nor pursuant to his order, but sold for their meat.

Section 134a(b) does not apply because it requires that the Secretary declare an extraordinary emergency and find the State not to have responded adequately to the emergency, and that the animals be "affected or exposed" to the disease. None of these conditions has been met: the emergency did not extend to Virginia, the Secretary never determined that the State of Virginia was inadequately responding, and plaintiffs' stock was not "affected or exposed." Therefore, it is concluded that plaintiffs are not entitled to payment for their stock pursuant to 21 U.S.C. § 134a.

■ To the extent that plaintiffs challenge the decision of the Secretary *not* to extend the declaration of extraordinary emergency to Virginia, this court has no jurisdiction to grant relief based on discretionary action not taken. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). And nothing in the statute indicates that Congress delegated to this court authority either to make that determination de novo or to review the Secretary's decision. A claim under the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.,* is also of no avail to plaintiffs since § 702 is not itself a grant of jurisdiction, *Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1978), and § 701(a) provides that the right of review by § 702 does not apply where agency action is committed to agency discretion by law. *See Pope v. United States,* 9 Cl.Ct. 479 (1986).

Plaintiffs also argue that they are also entitled to payment under 21 U.S. § 114a, which provides in pertinent part:

> The Secretary of Agriculture, either independently or in cooperation with State or political subdivisions thereof, farmers' associations and similar organizations, and individuals, is authorized to control and eradicate any communicable diseases of livestock or poultry * * * which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country, including the payment of claims growing out of destruction of animals (including poultry), and or materials, affected by or exposed to any such disease, *in accordance with such regulations as the Secretary may prescribe.* * * * [Emphasis added.]

Since § 114a does not itself require, but only authorizes, payment in accordance with regulations, it is necessary to examine the implementing regulations to see whether or not they entitle plaintiffs to payment.

The regulations pursuant to 21 U.S.C. § 114a are found at 9 C.F.R. § 53.[3] The regulations authorize payment of up to 100 percent of the "expenses of purchase, destruction and disposition of animals and materials *required to be destroyed because of being contaminated by or exposed* to" lethal avian influenza. 9 C.F.R. § 53.2 [Emphasis added.] Plaintiffs meet none of these criteria, and are ineligible for payment.

First, as explained previously, plaintiffs' turkeys were not "contaminated by or exposed to" lethal avian influenza despite the fact of the preventive quarantine. Tests showed the turkeys were healthy.

Second, because the flock was healthy, it was not "required to be destroyed" because of contamination or exposure. Plaintiffs concede that their decision to sell the stock for slaughter as meat was their own, made for economic, not health, reasons. And the record nowhere reveals that defendant ever ordered or undertook to have their stock destroyed.

Third, and most important, plaintiffs' stock was not "destroyed" for purposes of the regulatory payment program. Section 53.4(a) of 9 C.F.R. requires destruction as follows:

> Animals affected by or exposed to disease shall be killed promptly after appraisal and *disposed of by burial or burning, unless otherwise specifically provided* by the Deputy Administrator, Veterinary Services in extraordinary circumstances. [Emphasis added.]

The regulations also provide that animals and materials required to be destroyed "shall be appraised by a Veterinary Services employee", 9 C.F.R. § 53.3(a), and that the USDA will not allow any claim arising out of the destruction of animals and materials "unless they shall have been appraised as prescribed in this part and the owners thereof shall have executed a written agreement to the appraisals." *Id.* § 53.10(c).

The sale of plaintiffs' stock for slaughter as meat is clearly not "destruction" for purposes of the regulation. And plaintiffs have not alleged that they complied with the necessary appraisal requirements even were the sale for slaughter considered "destruction."

Accordingly, it must be concluded that neither the statute nor the regulations entitle plaintiffs to payment for the differ-

---

**3.** The emergency rules note that it is under § 53 that payments will be made where an emergency has not been declared (49 Fed. Reg. 3841):

> The interim rule [9 C.F.R. § 81] contains extraordinary emergency provisions which are applicable to States for which an extraordinary emergency has been declared. In this connection, the extraordinary emergency provisions provide for inspection and seizures upon premises; disposal of poultry and other items; cleaning of pens, coops, containers, troughs, other accessories, and means of conveyance; and appraisal and payment for destruction of poultry and other items.
> Also it should be noted that under the provisions of 9 CFR 53 there is authority for the Department to cooperate in the control and eradication of lethal avian influenza with States for which an extraordinary emergency has not been declared.

ence between the value of the stock as breeders and its value as meat.

Defendant is entitled to judgment on the statutory claims as a matter of law.[4] There being no dispute as to any material fact, defendant's motion for summary judgment on Count II of the complaint is GRANTED.

---

4. Plaintiffs' claim that they are entitled to payment for the period of time their specially designed equipment was required to remain idle must also fail since the regulations provide only for payment for equipment "required to be destroyed" and mere temporary disuse does not suffice as destruction.