**Andrew H. YANCEY and Elizabeth H. Yancey, Plaintiffs/Cross–Appellants,**

v.

**UNITED STATES, Defendant–Appellant.**

**Nos. 89–1698, 89–1729.**

United States Court of Appeals, Federal Circuit.

Sept. 28, 1990.

Thomas H. Yancey, Sidley & Austin, Washington, D.C., argued for plaintiffs/cross-appellants.

John S. Groat, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director. Also on the brief was William Jenson, Dept. of Agr., of counsel.

Before NEWMAN, Circuit Judge, MILLER, Senior Circuit Judge, and

MUECKE, Senior District Judge.*

MUECKE, Senior District Judge.

Seeking reversal of a Claims Court decision, the Government argues that the United States Department of Agriculture's (USDA) imposition of a poultry quarantine is not a taking compensable under the Fifth Amendment. On cross-appeal, the Yanceys seek a ruling that affirms the Claims Court's decision but that increases the amount recoverable or, alternatively, a ruling that remands the case for a determination of statutory compensation under 21 U.S.C. § 114a (1972). We affirm in part, reverse in part, and remand.

### BACKGROUND

This suit was brought by Andrew and Elizabeth Yancey to recover compensation for turkey breeder stock that was sold for slaughter as a result of a quarantine imposed by the USDA to control and eradicate an outbreak of lethal Avian Influenza in 1983-84.

In November, 1983, the Yanceys acquired a flock of 3,000 turkey breeder hens and 295 turkey toms for purposes of selling the turkey hatching eggs produced on their farm in Rockingham County, Virginia to customers outside the State.

In mid-October, 1983, an outbreak of pathogenic Avian Influenza, a highly contagious viral disease affecting poultry, occurred in Lancaster County, Pennsylvania. Although a mild form of the disease causes little death loss and a small drop in egg production, the pathogenic form can be very serious. In Lancaster County, more than ninety percent mortality occurred.

The USDA acted quickly by declaring an extraordinary emergency in Pennsylvania and promulgating regulations, pursuant to 21 U.S.C. § 134a (1972), that imposed a quarantine in certain areas of the state. Subsequently, outbreaks of the mild form of the disease in Maryland and Virginia were traced to the Pennsylvania outbreak. Though these areas were not declared an

emergency, the USDA amended its regulations pursuant to 21 U.S.C. § 114a because of concern that these cases might convert to the pathogenic form.

As a result, certain counties in Maryland and Virginia (including Rockingham County, Virginia) were quarantined. The quarantine applicable to the Yanceys prohibited interstate shipment of live poultry, manure from poultry, litter used by poultry, carcasses, eggs and certain equipment. 49 Fed.Reg. 3843. The USDA published regulations applicable to areas not under the declaration of an emergency, authorizing payment of up to 100% of the "expenses of purchase, destruction and disposition of animals and materials required to be destroyed because of being contaminated by or exposed to lethal avian influenza." 49 Fed.Reg. 3446–3448, amended at 9 C.F.R. § 53.2(b) (1990). The quarantine remained in effect in Virginia until September 14, 1984.

Testing showed no evidence of the disease in the Yanceys' flock. Nevertheless, they were not allowed to ship their turkeys or hatching eggs interstate during the quarantine. The Yanceys requested assistance from the Commissioner of Agriculture of Virginia but efforts to locate a market for the breeder stock or eggs proved unsuccessful.

The Yanceys spent up to $1,800 weekly to maintain the flock. They decided that keeping the flock alive for the indefinite duration of the quarantine would be uneconomical. They decided to sell the stock for meat, although the turkeys had not been "raised to be economically viable" for that purpose. The stock was sold for slaughter on February 13, 1984, for $20,887.

USDA denied the Yanceys' $63,556 claim for indemnity pursuant to 9 C.F.R. § 53.2(b) because their stock was healthy.

Next, the Yanceys filed suit in the U.S. Claims Court. The Yanceys alleged a taking of their property without compensation, in violation of the Fifth Amendment, be-

---

* Senior District Judge C.A. Muecke, United States District Court for the District of Arizona, sitting

by designation.

cause the quarantine prevented the interstate sale of their stock and thereby destroyed its economic value. They also alleged that defendant violated 21 U.S.C. § 114a. The Claims Court dismissed the Yanceys' statutory claim but, after trial, granted relief on the constitutional claim.

The Government filed this appeal and the Yanceys cross-appealed.

## ANALYSIS

■ This court reviews "Claims Court decisions for errors of law and clearly erroneous findings of fact." *Cooper v. United States,* 827 F.2d 762, 763 (Fed.Cir.1987); *Milmark Services, Inc. v. United States,* 731 F.2d 855, 857 (Fed.Cir.1984).

Though the Claims Court determined that under the Fifth Amendment the Yanceys were entitled to compensation, reexamination of the Yanceys' statutory arguments is also warranted at this time. The Supreme Court has developed an elaborate body of devices for avoiding difficult questions. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). If a suit may be resolved either by statutory construction or constitutional interpretation, the statutory approach is generally to be preferred. *See* L. Tribe, *American Constitutional Law,* at 71–72, 1017, 1032, & 1036–37 (2nd ed. 1988).

Thus, we turn first to the issue raised by the Yanceys on cross-appeal: whether the Yanceys may obtain the relief sought based on 21 U.S.C. § 114a.

## I. STATUTORY COMPENSATION

■ The central provision granting consent to suit in the Claims Court is the Tucker Act, 28 U.S.C. § 1491 (Supp.1990). *United States v. Testan,* 424 U.S. 392, 397, 96 S.Ct. 948, 952, 47 L.Ed.2d 114 (1976). This section does not create any substantive right of recovery against the United States for money damages. It merely confers jurisdiction upon the court whenever a substantive right exists. *Id.* at 398, 96 S.Ct. at 953. A claimant who is not relying upon breach of a contractual obligation, therefore, must look beyond 28 U.S.C. § 1491 and establish that some substantive provision of law, regulation, or the Constitution can be fairly construed as mandating compensation in order to state a claim within the jurisdiction of the court. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980).[1]

The Yanceys' turkey breeder flock was quarantined pursuant to the Secretary of Agriculture's authority under 21 U.S.C. § 114a. This statute allows the Yanceys a claim for compensation if it "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Testan,* 424 U.S. at 398, 96 S.Ct. at 953.

Section 114a of title 21 United States Code provides, in part:

The Secretary of Agriculture, either independently or in cooperation with States or political subdivisions ... is authorized to control and eradicate any communicable diseases of livestock or poultry ... which in the opinion of the Secretary constitute an emergency and threaten the livestock industry of the country, including the payment of claims growing out of destruction of animals (including poultry), and of materials, affected by or exposed to any such disease, in accordance with such regulations as the Secretary may prescribe....

Because the statute appears to give discretion to the Secretary, the Claims Court based its decision on whether the USDA complied with the regulations promulgated pursuant to 21 U.S.C. § 114a. *See* 9 C.F.R. § 53. The regulations authorize payment of up to 100% of the "expense of purchase, destruction and disposition of animals and materials required to be destroyed because of being contaminated by or exposed to" lethal Avian Influenza. 9 C.F.R. § 53.2.

The Claims Court ruled that none of the requirements under the regulations were

---

1. The Fifth Amendment "Taking Clause" is sufficiently self-executing as to mandate compensation by the Federal Government. *See Wilfong v.*

*United States,* 480 F.2d 1326, 202 Ct.Cl. 616 (1973).

satisfied. *Yancey v. United States*, 10 Cl.Ct. 311, 316 (1986). The Claims Court concluded that because the turkeys were healthy they could not be "contaminated by or exposed to" lethal Avian Influenza. Moreover, according to the Claims Court, because the flock was healthy, it was not "required to be destroyed." [2]

Finally, the Claims Court emphasized that the Yanceys' turkeys were not destroyed in a manner consistent with the regulations. Section 53.4(a) of 9 C.F.R. requires destruction as follows:

> Animals affected by or exposed to disease shall be killed promptly after appraisal and disposed of by burial or burning, unless otherwise specifically provided by the Deputy Administrator, Veterinary Services in extraordinary circumstances.

The Yanceys also failed to allege that their flock and materials had been properly appraised as required by regulation to obtain compensation. *See* 9 C.F.R. § 53.3(a) and § 53.10(c).

Yet, an inconsistency appears to have developed in the way the Government applies its regulations. On cross-appeal, to demonstrate this inconsistency, the Yanceys rely on *Loftin v. United States*, 6 Cl.Ct. 596 (1984), *aff'd*, 765 F.2d 1117 (Fed. Cir.1985), an authority that the Claims Court's opinion did not address. Though *Loftin* ultimately turned on other legal considerations, it is still relevant to our analysis because the Government interpreted 21 U.S.C. § 114a so as to allow compensation for destruction of non-diseased animals due to their close proximity to infected animals.[3]

Similarly, it is clear that the Government quarantined the Yanceys' breeder flock because of its proximity to the outbreaks of Avian Influenza in Virginia. Under the Government's prior interpretation of the statute in *Loftin*, the Yanceys' flock might have been classified as exposed to the disease and thereby made eligible for indemnities. Thus, according to the Yanceys, insofar as the actions of the Government in refusing to statutorily compensate them for their healthy flock are inconsistent with the approach taken in *Loftin*, the Government's actions appear to be arbitrary and capricious.

If regulations lead to an unreasonable or irrational result that is at odds with the underlying statutory intent, guidance should be sought from the legislative history. *Texas State Commission v. United States*, 796 F.2d 400, 406 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987).

21 U.S.C. § 114a was amended July 7, 1962; the amendment was intended to fill gaps in the prior legislation. *See* S.Rep. No. 582, 87th Cong., 1st Sess. 1 (1961), *reprinted in*, U.S.Code Cong. & Ad.News 1822, 1823–24 (1962). The amendment gave the Government authority to impose quarantines to control Avian Influenza and provide compensation to affected farmers. *Id.* During the legislative process, Representative Wright, a sponsor of the legislation, made it clear that the individual rights of farmers should be protected under the Secretary of Agriculture's broad new authority. *See* 108 Cong.Rec. H5571–5572 (1962).

The Yanceys argue that the Government's refusal to classify their turkey breeder flock as exposed to Avian Influenza for purposes of 21 U.S.C. § 114a was contrary to the disease control purposes of the statute. After all, the Government's

---

**2.** The Yanceys apparently conceded that their decision to sell the stock for slaughter as meat was their own, made for economic, not health, reasons. The Government never undertook to have the flock destroyed. *See Yancey v. United States*, 10 Cl.Ct. 311, 316 (1986).

**3.** *Loftin* involved a herd of approximately 900 dairy cattle, 278 of which reacted positively to tests for bovine tuberculosis. The owner was told that the remaining cattle, which tested negative, would have to be quarantined, but the USDA did not require them to be slaughtered. Nevertheless, the owner chose (probably for economic reasons) to have the entire herd slaughtered. Because of the proximity of the infected animals to the rest of the herd, USDA interpreted 21 U.S.C. § 114a, in accordance with the purpose of the statute, as allowing at least some "indemnity for each animal so destroyed." Thus, indemnity was available to the owner of the herd even for non-diseased cattle.

interpretation, as well as the Claims Court's ruling, provide those in the Yanceys' position with a perverse incentive to allow infection of their flocks in order to receive indemnities.

We agree with the Yanceys that denying compensation for their healthy flock is contrary to Congress' clear intent to promote cooperation with quarantine provisions. It is clear from the legislative history that the purpose of 21 U.S.C. § 114a is to control and prevent the spread of animal diseases and that the indemnity provisions are an integral part of this disease control scheme. *See* S.Rep. No. 2811, 84th Cong. 2d Sess. 1 (1956), *reprinted in,* U.S.Code Cong. & Ad.News 4366, 4367 (1956).

Unfortunately, it is not at all clear from the legislative history whether Congress intended for the indemnity provisions to extend to healthy animals. Without exception, throughout the legislative history, reference to compensation is linked to destruction of diseased animals. The legislative history of 21 U.S.C. § 114a demonstrates that either Congress neglected to consider the effect a quarantine might have on owners of healthy live stock and poultry or it actually believed that compensation need not be extended to the owners of healthy stock. Neither scenario is helpful to the Yanceys.

Despite the Government's prior favorable interpretation of 21 U.S.C. § 114a in *Loftin,* Congress' failure to explicitly create a right of compensation for healthy animals, precludes us from finding that the USDA's refusal to compensate the Yanceys was arbitrary or capricious. The Yanceys do not have a right to compensation under 21 U.S.C. § 114a. Thus, we now turn to the issue of whether the Yanceys are entitled to relief based on the "Just Compensation" Clause of the Fifth Amendment.

## II. THE FIFTH AMENDMENT

### A. *Whether a Compensable Taking Occurred*

■ The Fifth Amendment to the United States Constitution provides, in part, "nor shall private property be taken for public use, without just compensation." The purpose of this clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). This court must decide whether the poultry quarantine imposed a burden on the Yanceys which should be borne by the public as a whole.

The resolution of such issues depends largely on the particular circumstances involved in each case.

[W]e have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on *ad hoc, factual* inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

*Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *see also Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

The Claims Court reviewed the particular circumstances of this case in light of the *Penn Central* factors. The Claims Court found that the quarantine had reduced the value of their healthy turkey breeder flock seventy-seven percent from $91,616 to $20,887, the amount received from the slaughter. *Yancey v. U.S.,* Claims Court No. 413–85C, at 17 (filed December 30, 1988).

Even considering the receipt of $21,496 from the Commonwealth of Virginia, plaintiffs incurred a substantial loss on their investment. Although plaintiffs were able to mitigate their loss by slaughtering the flock, there was *no other alternative,* economically viable use for the flock while the quarantine was in effect.

*Id.* (emphasis added). Moreover, the Claims Court found the Yanceys learned about the quarantine from the newspaper only the day before it took effect. *Id.* at 18–19.

> At the time of the acquisition of the turkey breeder flock, plaintiffs had the investment-backed expectation to sell the hatching eggs to customers outside of Virginia. Defendant's actions in administering the quarantine resulted in an unforeseen and disparate impact upon plaintiffs.

*Id.* at 19. Because the Government has not demonstrated that the Claims Court's findings of facts were clearly erroneous, we accept these facts as true.

Relying on *Florida Rock Indus. v. United States*, 791 F.2d 893, 901 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), the Claims Court concluded that there is no "fixed formula" for determining when the Fifth Amendment comes into play. "[T]he Fifth Amendment ... does not find a taking in a mere denial of the 'highest and best use,' i.e., most profitable use, that would be available in the absence of regulation." *Id.* However, "a regulation ... can be a taking if its effect on a landowner's ability to put his property to productive use is sufficiently severe." *Id.* at 900.

Moreover, the Claims Court determined that even if the Government's regulatory action were presumed to be reasonable, a compensable taking may still occur. In *Department of Agriculture v. Mid–Florida Growers, Inc.*, 521 So.2d 101 (Fla.1988), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), the court held that Florida's destruction of citrus trees tested and found not to be infected with citrus canker, a communicable viral disease, was a compensable taking, despite the fact that the action was a valid exercise of police powers.

The Government takes issue with the Claims Court's conclusion that compensation must be provided for deprivation of the economically viable use of property even though the property remains within the use and control of the owner. We acknowledge that where there has been no physical appropriation of the property for public use, but rather merely a regulatory restriction upon use of property, the Supreme Court has generally held that the restriction is constitutionally permissible in the absence of compensation. *See Keystone Bituminous Coal Assoc. v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (when the private and public interests are weighed, "the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation"). Still, *Keystone* involved a facial challenge to a regulation under the Fifth Amendment; no evidence was offered of the regulation's economic impact. We favor the Yanceys' position that the *Keystone* opinion did not hold that the nature of governmental activity conclusively forecloses all claims for just compensation.

On the contrary, the Government's proper exercise of regulatory authority does not automatically preclude a finding that such action is a compensable taking. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27, 106 S.Ct. 455, 458–59, 88 L.Ed.2d 419 (1985). There should be no "blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority...." *Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979). "The application of a [regulation] to particular property effects a taking if the [regulation] ... denies an owner economically viable use of his land" (citations omitted). *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

The Government also attacks the Claims Court's primary reliance on cases involving ownership of real property. Despite the Government's attack, the Claims Court's reasoning is equally applicable to other significant property interests besides land ownership. There is no doubt that other property interests are also protected by the Fifth Amendment. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (the Supreme

Court determined that Fifth Amendment protection could cover an intangible trade-secret property interest). For Fifth Amendment purposes, the Yanceys' ownership of their turkey flock deserves just as much protection as if ownership of their farm had been appropriated.

The Claims Court held, based on the specific facts of this case, that compensation should be paid to the Yanceys pursuant to the "Just Compensation" Clause of the Fifth Amendment. Before we can adopt the same conclusion, one case that the Claims Court failed to mention must be addressed. *Empire Kosher Poultry, Inc. v. Hallowell*, 816 F.2d 907 (3rd Cir.1987), is a case that has similar facts and reaches a contrary holding.

In *Empire,* the court considered the imposition of a quarantine in Pennsylvania related to the same outbreak of Avian Influenza as in the instant case and held that there was no compensable taking. In both cases, the sellers of poultry were disadvantaged by Government imposed quarantines. The Yanceys try to distinguish the facts of the *Empire* case. They emphasize that in *Empire,* involving healthy chickens raised for slaughter, the birds could be sold within the quarantine area for the purpose for which they were raised. Moreover, in *Empire,* the seller chose to close his own processing plant after the quarantine was in effect and, in doing so, limited his own investment backed expectation. This leads us to the conclusion that, in the *Empire* case, the quarantine had less adverse economic impact on the seller than in the instant case.

Insofar as the *Empire* case can be distinguished from the instant case we choose not to follow it for that reason. Insofar as the two cases are similar, we choose not to follow *Empire* because we find it inconsistent with the intent of the Fifth Amendment. "Basic understanding of the Fifth Amendment makes clear that it is designed not to limit governmental interference with property rights *per se,* but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *First English Evangelical Luther-*

*an Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987) (a zoning regulation's temporary denial of a land owner's use of property amounted to a compensable taking).

In addition to the *Empire* case, it should be noted that the Claims Court's specific findings of fact preclude this court from relying on several other cases cited by the Government. For instance, the Government argues that the percentage diminution in value of the turkeys was too small to amount to a compensable taking. *See Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value caused by zoning law not a taking), and *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87½% diminution in value not a taking). However, we do not read these early precedents as creating an automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value. The Claims Court properly weighed all the relevant considerations, including percentage diminution in value, under the modern *Penn Central* approach and found that the Yanceys suffered severe economic impact. In view of the Claims Court's well supported factual findings, we cannot rule as a matter of law that the flock's percentage diminution in value was too small to warrant a taking.

Similarly, the Claims Court's findings of fact preclude this court from following *Galloway Farms, Inc. v. United States,* 834 F.2d 998, 1003 (Fed.Cir.1987). In *Galloway Farms,* the court ruled that the grain embargo imposed on the Soviet Union did not amount to a compensable taking under the Fifth Amendment for those farmers allegedly deprived of an economic use of their property because other markets remained open. The *Galloway Farms* case is distinguishable from the case at hand because in *Galloway Farms* the property owner had the opportunity to use his property in other economically viable ways. The Claims Court found that the Yanceys

had no choice but to sell their birds for substantially less than their value.[4]

There is simply no way that the Government can refute the Claims Court's findings of fact. When adverse economic impact and unanticipated deprivation of an investment backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate. Even when pursuing the public good, as the USDA was doing when it imposed the poultry quarantine, the Government does not operate in a vacuum. Bluntly stated, the consequences of the Government's action cannot be ignored. Why should the Yanceys be forced to bear their own losses when their turkeys were not diseased? The Yanceys' losses came about because of the Government's action. If the intent of the poultry quarantine was to benefit the public, the public should be responsible for the Yanceys' losses.

### B. *Just Compensation*

Having concluded that a compensable taking occurred, the next issue to be addressed is whether the Claims Court's calculation of compensation was correct.

### 1. LOST PROFITS

■ The Government argues that, in addition to correctly allowing the Yanceys compensation according to USDA's indemnity tables, the Claims Court gave the Yanceys an impermissible bonus for lost profits. The Supreme Court has specifically addressed and rejected the availability of lost profits under the Fifth Amendment. "[C]ompensation for the interest does not include future loss of profits." *United States v. General Motors Corp.*, 323 U.S. 373, 379, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945).

■ Instead, fair market value should be used to determine the amount of compensa-

tion. Fair market value is defined as follows:

> the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts.

*Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1054 n. 3 (Fed.Cir. 1983). However, the fair market value of property under the Fifth Amendment can include an assessment of the property's capacity to produce future income if a reasonable buyer would consider that capacity in negotiating a fair price for the property. *See Yachts America v. United States*, 779 F.2d 656, 660 (Fed.Cir.1985), *cert. denied*, 479 U.S. 832, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986).

The Government's suggestion that the Claims Court erred in ascertaining the value of the Yanceys' healthy flock is really another disguised challenge to a factual finding. The indemnity tables used by USDA to compensate owners of diseased flocks do not include an allowance for the value of such birds as hatching egg producers to a willing buyer. In fact, government documents received into evidence demonstrated conclusively that those tables reflected only the standard costs incurred in maintaining such birds to a given age, with no allowance for their commercial value.

The Claims Court apparently concluded that the USDA's cost-based standard was insufficient to determine the value of a healthy breeder flock that has the capacity to produce hatching eggs. Such a finding is sufficiently supported by the facts and, therefore, is not clearly erroneous.

### 2. DATE WHEN FAIR MARKET VALUE WAS CALCULATED

■ On cross-appeal, the Yanceys argue that the Claims Court erred by not award-

---

4. The same distinction can be made concerning another case referred to by the Government—*Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). In *Andrus*, the Supreme Court ruled that a complete prohibition on the sale of avian artifacts under the Eagle Protection Act and the Migratory Bird Treaty Act did not constitute a taking. "The denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id.* at 65–66, 100 S.Ct. at 327.

ing damages based on the fair market value of their breeder flock on the date it was slaughtered.

Fair market value under the Fifth Amendment is normally ascertained at the date the governmental restrictions are imposed, which is the date of the taking. *E.g., Kirby Forest Industries v. United States*, 467 U.S. 1, 14, 104 S.Ct. 2187, 2196, 81 L.Ed.2d 1 (1984). However, the Yanceys say that the goal of just compensation under the Fifth Amendment is to put the owner of property "in as good a position pecuniarily as if his property had not been taken." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). To achieve the goal, the Yanceys advocate flexibility in determining the point at which fair market value is calculated. We are aware of no cases allowing the flexibility that the Yanceys advocate.

In this case, it is apparent that the trial judge took a variety of factors into consideration to decide the best way to calculate fair market value. Nothing suggests that the trial judge's calculation of fair market value was arbitrary or capricious.

### C. *Extra Costs*

The Government also challenges two of the litigation expenses that the Claims Court awarded to the Yanceys.

### 1. EXPENSES INCURRED BEFORE FILING COMPLAINT

■ While pre-litigation expenses are precluded from reimbursement under 42 U.S.C. § 4654(c) (1983). *Emeny v. United States*, 526 F.2d 1121, 1124, 208 Ct.Cl. 522 (1975) (*per curiam* adopting the decision of the trial judge), "the significant effort expended" in "the filing of the petition" may be compensable under the statute if proper documentation were provided. *Cloverport Sand & Gravel Co. v. United States*, 10 Cl.Ct. 121, 124 (1986). Therefore, as long as the parties were given an opportunity to document and challenge the reasonableness of the pre-litigation expenses, we will defer to the trial judge's discretion concerning the award.

### 2. THE EXPERT TESTIMONY OF THE YANCEYS' SON

■ The trial court never addressed the Government's objection to reimbursement of the fees for the expert testimony of the Yanceys' son, Richard. The only evidence before the Claims Court was that Richard Yancey ordinarily charged $900. However, no evidence was ever presented that the Yanceys actually incurred any expense for their son's appearance and testimony. *See Foster v. United States*, 3 Cl.Ct. 738 (1983) (fees and costs must be incurred). In the absence of any proffer that the Yanceys actually incurred any expense for the appearance and testimony of their son at trial, the Claims Court erred in allowing the $900 claimed for his appearance.

### CONCLUSION

In an effort to avoid constitutional difficulties, we first examined the Yanceys' statutory claim. Only after concluding that 21 U.S.C. § 114a did not provide the Yanceys with relief did we take up the Yanceys' Fifth Amendment claim.

We limited our review of the Claims Court ruling on the Yanceys' Fifth Amendment claim to a consideration of whether the specific facts of this case warrant compensation under the current law. Under *Penn Central*, the particular circumstances of each case must be considered. In this case, the Claims Court found that the Yanceys suffered severe economic impact and had no way of anticipating the interference with their investment backed interest. Furthermore, the facts demonstrate that the Yanceys' flock was healthy, that they followed the USDA's regulations, and that they properly mitigated their damages, by selling their flock, when the poultry quarantine became overly burdensome. Nevertheless, the Yanceys' turkey business was wiped out through no fault of their own; just compensation is warranted in this case. The Claims Court's ruling is well founded.

Only the extra cost issues need be remanded for additional consideration.

WE AFFIRM IN PART, REVERSE IN PART, AND REMAND.