JUSTICE COTTER
delivered the Opinion of the Court.
¶1 Bruce and Shirley Buhmann (Buhmanns), owners and operators of the Circle Eagle Game Farm, and Len and Pamela Wallace (Wallaces), owners and operators of the Big Velvet Ranch, appeal an order of the First Judicial District Court which denied their takings claims under the Fifth Amendment to the U.S. Constitution and Article II, Section 29 of the Montana Constitution. These claims alleged that the enactment and enforcement of initiative measure no. 143 (1-143), which was approved by the citizens of Montana on *207 November 7, 2000, constituted a taking of their private property and that they were entitled to just compensation for this taking. For the reasons set forth below, we affirm the District Court.
FACTUAL AND PROCEDURAL BACKGROUND
¶2 The case at bar involves takings claims very similar to claims we recently addressed in Kafka v. Mont. Dept. of Fish, Wildlife and Parks, 2008 MT 460, 348 Mont. 80, 201 P.3d 8. Insofar as the background information and our decision and reasoning in Kafka applies to the case at bar, we will refer to that case. Where the arguments and issues raised by the present appellants are distinct from those raised by the parties in Kafka, we will address their merits accordingly.
¶3 The appellants in this case were owners and operators of alternative livestock game farms (Game Farms) within the state of Montana. The Game Farm industry is premised on the notion that individuals are willing to pay significant amounts of money to shoot captive animals, primarily elk, within the confines of a Game Farm. Since 1917, it has been lawful for individuals to own alternative livestock, such as elk, and keep them in captivity. Game Farms are heavily regulated by the Montana Department of Fish, Wildlife, and Parks (FWP) because of the threat posed by chronic wasting disease (CWD), a fatal disease of the central nervous system of captive and free-ranging animals such as mule deer, white-tailed deer, and Rocky Mountain elk. Kafka, ¶ 2. To operate a Game Farm, the owner/operator must possess an alternative Game Farm license and comply with the rigorous and extensive licensing requirements set forth in Title 87, chapter 4, part 4, MCA. See Kafka, ¶¶ 2, 8.
¶4 On November 7,2000, the voters of Montana passed 1-143, which made two significant changes to the regulation of Game Farms in Montana. See Kafka, ¶¶ 6-9. First, it prohibited fee-shooting on Game Farms in Montana. Second, 1-143 prohibited licensees from transferring their alternative livestock licenses to others. These changes had a significant impact on the Game Farm industry in Montana because the vitality of the Game Farm industry was premised upon the profits derived from fee-shooting. The ban on the transfer of licenses was significant because it essentially prohibited Game Farm owners from selling those Game Farms to others, since a Game Farm could not operate without a valid license. 1-143 did not, however, eliminate all uses of alternative livestock as it still permitted Game Farm operators to own herds, harvest the animals for their meat or antlers, or sell them in out-of-state markets where fee-shooting was *208 legal. Kafka, ¶¶ 7-8.
¶5 The enactment and enforcement of 1-143 led to several lawsuits in both state and federal court in Montana. At the time of this suit, the Buhmanns resided in Blaine County, Montana, and owned and operated the Circle Eagle Game Farm, a twenty-nine acre game farm which was regulated by FWP. The Buhmanns began the Circle Eagle Ranch in 1997 after applying for and receiving a loan from the state of Montana’s Department of Commerce. The Buhmanns’ loan application included a business plan describing an elk-breeding program they planned to institute. This plan included the annual selling of wholesale mature bulls to shooting operations, and the selling of retail mature cows to other breeding operations. The Buhmanns and the Circle Eagle Ranch received an alternative livestock license through FWP which allowed them to keep sixty elk. They began selling elk in 1999. In addition to selling elk, the Buhmanns also sold a mineral supplement for captive deer and elk called Sweet Pro.
¶6 The Wallaces started the Big Velvet Ranch in Ravalli County, Montana, after obtaining a Game Farm license in 1992. The Big Velvet Ranch eventually encompassed roughly 2000 acres. In the course of developing their ranch, the Wallaces purchased material for fencing and other infrastructure, constructed a lodge on the property, removed the native deer and elk, and then imported alternative livestock (elk) from other locations. The Wallaces raised captive elk, and provided opportunities for the fee-shooting of elk on the Big Velvet Ranch. Under this service, clients would come and stay on the Big Velvet Ranch and be guaranteed to shoot an elk within the confines of the ranch. Additionally, the Wallaces bred captive elk for other Game Farms.
¶7 According to the factual assertions in their complaint, the Wallaces invested millions of dollars in developing the Big Velvet Ranch, and took a number of measures to ensure that their alternative livestock was of the highest quality and was disease-free. In 1999, after a three-year testing process, the Big Velvet Ranch was certified as tuberculosis-free, and in 2001 certified as brucellosis-free. Additionally, the Wallaces tested roughly 700 animals from the Big Velvet Ranch for CWD, and all those tests came back negative. The Wallaces also claim they developed prototype feed trucks, and appropriate facility modifications which would allow them to maintain a high nutritional level of the elk, at a cost of over $600,000. The Wallaces further stated that they took other measures, including the hiring of a veterinarian and the development of extensive monitoring systems, to ensure that *209 their operation established a reputation as one of the most successful private elk ranches in the United States.
¶8 From 1997 through 1999, the Wallaces claim to have harvested over 100 mature bulls and earned gross revenues of over $1 million per year. The Wallaces allege that their ranch guests would pay on average $7,000 for hunting mature bull elk, and that this comprised the majority of the ranch’s revenues. Between 1995 and 2000, the Wallaces hosted more than 600 clients.
¶9 After the passage of 1-143, and its interpretation by the Attorney General’s office and FWP, the Wallaces claim that their existing and prospective customers cancelled their plans to visit the Big Velvet Ranch, and that many demanded refunds on their deposits. Similarly, there was a cancellation of promised purchases of animals and feed from the Circle Eagle Ranch. The Wallaces claim that in order to stem the financial hemorrhaging at the ranch, they contacted various Indian tribes in Montana to assess their interest in receiving approximately 500 animals from the Big Velvet Ranch. After obtaining the appropriate permits, the Wallaces thereafter entered into an agreement with the Crow Indian Tribe to transfer some of their animals. After the first shipment of 67 elk, the Wallaces were enjoined in the First Judicial District Court from transferring any more of their alternative livestock to the Crow Indian Reservation to be released in an unfenced area. The Wallaces appealed the issuance of this injunction to this Court, and it was upheld in Hagener v. Wallace, 2002 MT 109, 309 Mont. 473, 47 P.3d 847. The Wallaces also sought injunctions against the enforcement of 1-143 in Ravalli County District Court, as well as separately in the federal district of Montana, both of which were denied. Moreover, Len Wallace was tried and convicted in Justice Court for violating I-143’s ban on fee-shooting.
¶10 On June 6,2002, the Wallaces and Buhmanns filed a joint action against the state of Montana, Attorney General Mike McGrath, and FWP Director Jeff Hagener in the Seventeenth Judicial District Court, Blaine County, seeking damages for the taking of their private property under the Fifth Amendment and Article II, Section 29 of the Montana Constitution. The Wallaces and Buhmanns alleged that 1-143 violated the Fifth Amendment’s prohibition on the taking of private property without just compensation, as well as Article II, Section 29’s prohibition on a damaging of their property. The Wallaces and Buhmanns alleged that 1-143 affected a taking of their private property rights without just compensation “by specifically taking the only viable source of profitability (i.e., shooting animals for a fee), and *210 thereby destroying the Montana breed stock sale market, and prohibiting the transfer of licenses.” The Wallaces and Buhmanns alleged that the State enforced 1-143 to the detriment of their property rights and that this enforcement imposed new retroactive liabilities on them, damaging their vested property rights as well. Additionally, the Wallaces and Buhmanns alleged that by prohibiting the transfer of their licenses and the value of their investments in their Game Farms to others, the State took not only their “property rights and licenses, but also the profitable use of the land, and the increased value of the land as a result of the prior issued licenses.” The Buhmanns and Wallaces also alleged that McGrath and Hagener violated their constitutional rights by enforcing 1-143 against them, and brought a claim for relief under 42 U.S.C. § 1983.[1]
¶11 The precise nature of the Buhmanns’ and Wallaces’ claims differed slightly. Because the Buhmanns did not provide fee-shooting services, their business operations were not directly affected by 1-143. However, by eliminating the in-state market for fee-shooting, 1-143 had a significant economic impact on the profitability of their breeder operation and their marketing of Sweet Pro. The Wallaces, on the other hand, were directly affected since the Big Velvet Ranch provided fee-shooting services.
¶12 On July 22,2002, the State filed a motion to change the venue of the case from Blaine County to the First Judicial District, Lewis and Clark County, pursuant to § 25-2-116, MCA. On August 16, 2002, the Wallaces and Buhmanns filed a motion to sever the parties, pursuant to M. R. Civ. P. 21. In the motion, the Buhmanns argued that their action should remain in Blaine County, while the Wallaces argued that they should be able to pursue their cause of action in Ravalli County under a complaint they filed there on August 6, 2002. On August 28, 2002, the Blaine County District Court denied the motion to sever and granted the State’s motion to change the venue of the case to Lewis and Clark County.
¶13 On September 17, 2002, the First Judicial District Court, Judge Dorothy McCarter presiding, assumed jurisdiction over the appellants’ suit. On October 10,2002, the District Court granted a motion filed by appellees Sportsmen for 1-143 and Montana Wildlife Federation to intervene in this matter. Initially, the District Court set a jury trial to *211 hear appellants’ claims. However, the State subsequently filed a motion to bifurcate the proceedings, arguing that the issue of whether the State was liable for a taking should be decided solely by the District Court. If the State was found liable, then the issue of damages would be submitted to a jury. The appellants resisted the State’s motion, asserting that they were entitled to a jury trial on the issue of takings liability.
¶14 The State also filed a motion seeking summary judgment on appellants’ takings claims. One aspect of the State’s motion dealt with the issue of whether appellants could assert a categorical takings claim with respect to their personal property (e.g., alternative livestock, and Game Farm equipment). The State argued that under the authority of Lucas v. S.C. Coastal Council, 505 U.S. 1003, 112 S. Ct. 2886 (1992), a categorical taking claim may be asserted only for claims regarding a taking of land, and not for a taking of personal property or other property interests. See Kafka, ¶¶ 67-69 (noting the distinction between categorical and regulatory takings claims). Since the appellants’ land all retained significant value in spite of the passage of 1-143, a categorical taking claim would fail in this case. Additionally, the State argued that it was further entitled to summary judgment on appellants’ regulatory takings claims.
¶15 After holding a hearing on these motions on October 6, 2004, the District Court granted a portion of the State’s motion, concluding that the question of whether there had been a taking presented a question of law to be determined by the District Court without a jury. If a taking was found by the District Court, it would submit the issue of damages to a jury. Additionally, while the District Court ultimately denied the State’s summary judgment motion and concluded that it would hold a bench trial on appellants’ takings claims, it agreed with the State that under Lucas, personal property could not form the basis for a categorical takings claim. Moreover, the District Court agreed with a legal argument raised in the State’s brief that the same analysis, based on federal law, applied to takings claim, whether brought under Article II, Section 29 of the Montana Constitution or the Fifth Amendment to the U. S. Constitution.
¶16 Beginning on November 30,2004, the District Court held a three-day bench trial on appellants’ takings claims. The District Court heard testimony from Bruce Buhmann, Len Wallace, Dr. Peter Nickerson (Dr. Nickerson), an economist and expert witness for appellants, as well as other witnesses for both parties. The District Court also received a number of exhibits into evidence. Based on this evidence *212 and testimony, the District Court made a number of factual findings with respect to the Wallaces’ and Buhmanns’ operations and property interests.[2]
¶17 With respect to the Wallaces, the District Court found that they had complied with the licensing requirements set forth by FWP in the operation of the Big Velvet Ranch. The District Court noted that as the Wallaces sought to expand their operation over the years, they had applied with FWP for the necessary expansion permits. In 1997, the Wallaces were denied an expansion request by FWP which would have added approximately 1000 acres to the then-existing roughly 2000 acre ranch. After this denial, the Wallaces decided to sell their property out of a concern that they would not have enough grazing land for their elk. They subsequently acquired a Game Farm in Wisconsin to provide grazing land for their animals, but were prevented from shipping the animals back and forth due to outbreaks of CWD on Game Farms in several states, including Montana. Additionally, the District Court found that prior to 1-143, the Wallaces had difficulty marketing their elk outside of Montana because of a moratorium on interstate elk shipments from Montana as a result of a CWD outbreak on a Montana Game Farm in 1997. The District Court further found that an outbreak of CWD on another Game Farm impacted the ability of the Wallaces to sell their property and that it was still on the market at the time I-143 went into effect.
¶18 The District Court found that after the passage of 1-143, the Wallaces began selling off their elk and Game Farm equipment at a “substantial loss” compared with their pre-I-143 value. Between 1997 and 1999, the Wallaces spent approximately $666,166 to purchase elk. Len Wallace testified that the value of his elk herd prior to 1-143 was roughly $5.5 million. After 1-143, he liquidated the herd for approximately $238,000, and in some cases simply donated his elk to various organizations. Additionally, the Wallaces sold some of their *213 specialized equipment, which cost approximately $600,000to purchase, for $150,000. The District Court found that the net income from the Big Velvet Ranch for the four-year period prior to 1-143 was $1,480,452. Financial records prepared by Dr. Nickerson demonstrated that the Wallaces had a basis of $4,595,123 in their business. Between 1994 and 2003, the records indicated numerous sales of parcels of land ranging between ten and forty acres, totaling more than $1 million dollars, as well as two sales of property to another ranch for more than $5 million dollars.
¶19 In total, the District Court concluded that the Wallaces suffered a significant, but not complete, loss of value to their Game Farm business as a result of 1-143. The District Court quantified this loss as a fifty percent reduction in the value of their business. This figure apparently took into account the fact that while the Wallaces’ elk suffered a significant devaluation, the real estate associated with the Big Velvet Ranch had in fact appreciated. The District Court further found that while the market for alternative livestock elk had declined, alternative livestock could still be bred and sold to Game Farms in other states.
¶20 With respect to the Buhmanns, the District Court found that when they initially purchased the land on which the Circle Eagle Game Farm is located in the mid-1980’s, they had no intention of operating a Game Farm but chose that course much later. The District Court found that the Buhmanns purchased all of their elk in 1997 for $29,500, and began selling them in 1999. Their total sales receipts through 2000 were $8,948, and they received $11,963 from elk sales in 2001 and 2002. They anticipated selling approximately 10 calves a year for about $30,000. With respect to their sales of Sweet Pro, the District Court found they had gross sales for this product of approximately $68,000 between 2000 and 2002. For the overall period of their business from 1997 to 2002, they had a net business loss of $41,325. With respect to the impact on their business from 1-143, the District Court found that no aspect of that business was prohibited because they did not operate a fee-shooting operation. However, 1-143 did affect the market for both their alternative livestock and Sweet Pro. The District Court concluded that the Buhmanns suffered a net loss of $22,000 as a result of 1-143.
¶21 In its conclusions of law, the District Court began by restating its determination that the same legal analysis, based upon federal law, applied to claims whether brought under the Fifth Amendment or Article II, Section 29. Moreover, the District Court stated that a *214 categorical takings claim did not lie in this case under Lucas because categorical takings apply only to takings of land. The District Court then went on to reject appellants’ claims for a regulatory taking under the analytical framework set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646 (1978). See Kafka, ¶¶ 67-73 (discussing Penn Central regulatory takings analysis). The reasoning and analysis of the District Court will be discussed in greater detail below.
¶22 The Wallaces and Buhmanns now appeal the denial of their takings claims by the District Court. They present the following issues on appeal:
¶23 Issue One: Did the District Court err in changing the venue of the proceedings to Lewis and Clark County and denying appellants’motion to sever the Wallaces’ claims?
¶24 Issue Two: Did the District Court err in concluding that liability for appellants’ takings claims would be decided by the court instead of a jury?
¶25 Issue Three: Did the District Court err in concluding that Article II, Section 29 of the Montana Constitution does not provide any greater constitutional protection against the taking of private property than the Fifth Amendment to the U. S. Constitution, and that the same legal analysis applies to takings claims brought under the Fifth Amendment to the U. S. Constitution and Article II, Section 29 of the Montana Constitution?
¶26 Issue Four: Did the District Court err in denying appellants’ claim that 1-143 affected a categorical taking of their personal property?
¶27 Issue Five: Did the District Court err in concluding that I-143 did not affect a regulatory taking of appellants’ private property?
STANDARD OF REVIEW
¶28 We review a district court’s findings of fact under the clearly erroneous standard, and its conclusions of law for correctness. Roe Family, L.L.C. v. Lincoln Co. Bd. of Commsrs., 2008 MT 70, ¶ 12, 342 Mont. 108, ¶ 12, 179 P.3d 514, ¶ 12. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been committed. Roe Family, ¶ 12.
*215 DISCUSSION
¶29 Issue One: Did the District Court err in changing the venue of the proceedings to Lewis and Clark County and denying appellants’motion to sever the Wallaces’ claims ?
¶30 The Seventeenth Judicial District Court, Blaine County, granted the State’s motion to transfer the case to Lewis and Clark County where the merits of appellants’ takings claims were ultimately decided. The appellants argue that the District Court erred in granting the change of venue. In its order, the Blaine County District Court found that a change of venue was proper under § 25-2-116, MCA, which reads as follows:
25-2-116. Multiple claims. In an action involving two or more claims for which this part designates more than one as a proper place of trial, a party entitled to a change of place of trial on any claim is entitled to a change of place of trial on the entire action, subject to the power of the court to separate claims or issues for trial under Rule 42(b) of the Montana Rules of Civil Procedure.
¶31 Although the Wallaces’ and Buhmanns’ complaint asserted only two counts, the District Court determined that they asserted more than two claims for purposes of the statute because the specific allegations and relief sought by the Buhmanns was sufficiently distinct from the specific allegations and relief sought by the Wallaces. The District Court observed that it is the nature of the rights asserted and demand for relief sought that determines the number of claims, rather than a formal designation in the complaint itself. The District Court noted that the Wallaces and Buhmanns each detailed different locations and businesses which were differently affected by 1-143, and that the damages in each case differed based not only on these different locations but also on the duration of the effect, the type of the business, and the extent of the respective parties’ investments.
¶32 The District Court also noted that because their claims were brought against the state of Montana, the proper venue for the claims, pursuant to § 25-2-126, MCA, would be either the county of the plaintiffs’ respective residences or Lewis and Clark County. That statute reads in pertinent part as follows:
The proper place of trial for an action against the state is in the county in which the claim arose or in Lewis and Clark County. In an action brought by a resident of the state, the county of the plaintiffs residence is also a proper place of trial.
Section 25-2-126(1), MCA.
¶33 Here, the parties resided in different counties. The Buhmanns *216 resided in Blaine County, while the Wallaces resided in Ravalli County. Therefore, while Blaine County would be a proper venue under the statute for the Buhmanns, it would not be proper for the Wallaces. Thus, under § 25-2-126(1), MCA, Lewis and Clark County would be the only appropriate venue for all parties. Since the State was entitled to a change of venue under § 25-2-116, MCA, by virtue of the presence of multiple claims, the Blaine County District Court concluded that a change of venue to Lewis and Clark County was appropriate.
¶34 Additionally, the District Court denied a motion filed by the appellants to keep the Buhmanns’ claims in Blaine County, and allow the Wallaces to sever their claims and pursue a newly-filed complaint in Ravalli County. On the one hand, the District Court concluded that the Buhmanns had failed to show good cause under M. R. Civ. P. 42(b), to separate the claims, and further failed to demonstrate how their access to court in Lewis and Clark County would be impractical or expensive. With respect to the Wallaces’ motion to sever, the District Court denied that motion under the authority of Emery v. Federated Foods, Inc., 262 Mont. 83, 863 P.2d 426 (1993), for the simple reason that the motion to sever had yet not been filed at the time the State filed its motion for change of venue.
¶35 On appeal, the Wallaces and Buhmanns maintain the District Court erred in its application and interpretation of these statutes, and assert that they simply do not cover scenarios involving multiple plaintiffs. They maintain that the District Court’s interpretation unfairly deprives them of their right to choose venue. They argue that the intent of these statutes is to prevent plaintiffs from adding spurious claims to prevent defendants from obtaining a favorable venue, a concern not present in this case.
¶36 With respect to the denial of the motion to sever, the appellants argue that the District Court’s decision not to consider the motion due to its timing directly contravenes the holdings in both DML, Inc. v. Fulbright, 2005 MT 204, 328 Mont. 212, 119 P.3d 93, and Emery. Appellants argue that the doctrine that propriety of venue is determined as of time of the complaint, applies only in situations where the composition of the parties changes, and was not intended to freeze in time all activities occurring in a case-including the motion to sever which was filed here. Accordingly, they argue that the motion to sever should have been considered and granted by the District Court.
¶37 The State maintains that DML controls and demonstrates that the District Court correctly permitted a change of venue to Lewis and *217 Clark County. With respect to the motion to sever, the State points out that the decision of whether to sever claims lies within the District Court’s discretion under § 25-2-116, MCA, and M. R. Civ. P. 42(b), in furtherance of convenience and to avoid prejudice. Here, the District Court explicitly found that the appellants failed to make a showing justifying the invocation of M. R. Civ. P. 42(b). The State asserts that appellants have not challenged this finding on appeal.
¶38 “The determination of whether a county is the proper place for trial is a question of law involving the application of the venue statutes to pleaded facts.” DML, ¶ 7. Our review of such decisions is plenary, meaning we determine whether the district court’s ruling was legally correct. DML, ¶ 7. We conclude that the Blaine County District Court did not err in permitting the State to change the venue of appellants’ cause of action to Lewis and Clark County.
¶39 In DML, this Court interpreted § 25-2-116, MCA, as follows:
By the words of § 25-2-116, MCA, “a party entitled to a change of place of trial on any claim is entitled to a change of place of trial on the entire action.” This statute contemplates a multiple claim situation in which the county where the plaintiff files is proper for one claim but not for one or more of the others. As recognized by the Evidence Commission Comments to § 25-2-116, MCA, this Court has ruled consistently that a defendant entitled to a change of venue on one claim should have it on the entire action.
DML, ¶ 16.
¶40 Here, it is patent that venue in Lewis and Clark is proper with respect to the Buhmanns’ claims by virtue of § 25-2-126(1), MCA. Because the Wallaces reside in Ravalli County, venue is appropriate there, or in Lewis and Clark County. Under DML, therefore, the State is entitled to a change of venue with respect to the entire action. See DML, ¶ 27 (Gray, C.J., concurring) (concluding that change of venue is appropriate under § 25-2-116, MCA, when action consists of multiple claims, venue statutes designate more than one county for one or more claims, and action is brought in a county which is proper for one, but not all, of those claims). Since Lewis and Clark County is an appropriate venue for all parties in this case, the District Court did not err in allowing the change of venue.
¶41 With respect to the Blaine County District Court’s refusal to consider the motion to sever, we agree with the State that the District Court acted within its discretion in denying such motion. Decisions as to trial administration matters, such as a motion to bifurcate or sever, are within the “broad discretion” of the district court. Jarvenpaa v. *218 Glacier Elec. Cooperative, Inc., 1998 MT 306, ¶ 12, 292 Mont. 118, ¶ 12, 970 P.2d 84, ¶ 12. In this case, regardless of whether the District Court could or should have considered the merits of the motion to sever, it stated clearly in its order that appellants had failed to demonstrate good cause to sever, as required under M. R. Civ. P. 42(b). Appellants do not challenge this finding. Thus, we affirm the Blaine County District Court’s decisions as to venue and severance.
¶42 Issue Two: Did the District Court err in concluding that liability for appellants’ takings claims would be decided by the court instead of a jury?
¶43 In its October 22, 2004 Decision and Order, the Lewis and Clark County District Court granted a motion filed by the State to bifurcate the liability and damages phases of these proceedings, allowing the former to be determined solely by the District Court, while the latter would be heard by a jury if the District Court determined the State was liable for an uncompensated taking. The District Court concluded that the question of whether there was a taking is a question of law, and that a property owner’s right to a jury trial was limited to the issue of damages.
¶44 The District Court determined that its position was consistent with City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 119 S. Ct. 1624 (1999)-a case relied upon by appellants for their argument that they were entitled to a jury trial on the issue of takings liability. The District Court considered whether the issues of damages and liability were intertwined, or were distinct and should be presented separately, and concluded there was no practical reason to subject jurors to evidence unrelated to the issue of damages. Additionally, the District Court determined that it needed adequate time to consider liability before proceeding with a trial on damages-an exercise that would be moot if liability was decided in favor of the State.
¶45 Appellants maintain that the District Court erred and wrongfully denied them their right to a jury trial on the issue of takings liability. Citing to Howard v. State, 198 Mont. 470, 647 P.2d 828 (1982) and Butte Country Club v. Metro. Sanitary and Storm Sewer Dist. No. 1, 164 Mont. 74, 519 P.2d 408 (1974), appellants maintain that individuals asserting inverse condemnation claims have historically been entitled to jury trials. Citing to Matter of C.L.A., 211 Mont. 393, 685 P.2d 931 (1984), they further argue that under Article II, Section 26 of Montana Constitution, their fundamental right to a trial by jury is guaranteed as to all class of cases in which the right was enjoyed *219 when the Montana Constitution was adopted in 1889. Appellants argue that this class of cases extends beyond those common-law actions recognized in 1889, and includes modern-day actions that involve rights and remedies of the sort traditionally enforced in an “action at law,” such as the takings claims they presented here.
¶46 Under the authority of Del Monte Dunes, appellants argue that their suit for an uncompensated taking of their property is an action at law, and that the reasoning in Del Monte Dunes is supported by Montana cases, including Solberg v. Sunburst Oil & Gas Co., 70 Mont. 177, 225 P.2d 612 (1924) and Chessman v. Hale, 31 Mont. 577, 79 P. 254 (1905). See Del Monte Dunes, 526 U.S. at 709-10, 119 S. Ct. at 1638 (action sounding in tort and seeking legal relief is an action at law); see also Little v Little, 127 Mont. 152, 155-56, 259 P.2d 343, 344 (1953) (actions at law include actions to recover specific personal property with damages). Appellants maintain that the Lucas and Penn Central tests for analyzing takings claims are factual inquiries which are properly allocated to a jury. They therefore argue that the District Court erred in concluding that the determination as to whether a taking has occurred is a question of law, and maintain instead that it is a question of fact.
¶47 The State maintains that because there is no established tradition of trials by jury in regulatory takings cases in Montana, this Court decides this issue on a “clean slate.” The State then asserts that appellants’ reliance on Del Monte Dunes is misplaced because that case involved solely the question of whether a plaintiff was entitled to a jury trial under the Seventh Amendment to the United States Constitution for an action brought under 42 U.S.C. § 1983. The State maintains that Del Monte Dunes did not address the question of whether plaintiffs are generally entitled to a jury trial on the issue of liability in takings cases. The State notes that other jurisdictions, such as California, have generally held that the issue of liability in a takings claim is a question of law for the court, with a right to a jury trial available on the issue of damages. Accordingly, the State urges affirmance of the District Court on the grounds that the question of whether a taking has occurred is primarily a legal question to which no right to jury trial exists.
¶48 Whether an individual is entitled to a jury trial presents a question of law which we review de novo for correctness. Supola v. Mont. Dept. of Justice, Drivers License Bureau, 278 Mont. 421, 423, 925 P.2d 480, 481 (1996). As an initial matter, we agree with the State that the question before the Court is one of first impression in the state of *220 Montana. Appellants are correct in observing that in both Howard and Butte Country Club, the trial courts apparently afforded claimants jury trials in inverse condemnation cases. See Howard, 198 Mont. at 472, 647 P.2d at 829; Butte Country Club, 164 Mont. at 76, 519 P.2d at 409. However, neither case provides any analysis or discussion which would bear on the issue of whether appellants’ categorical and regulatory takings claims should be submitted to a jury, and neither case has ever been cited as authority on this point of law.
¶49 We therefore turn to Del Monte Dunes, upon which the State and the appellants rely for their opposite positions. In that case, a property owner (Del Monte Dunes) brought an action against the city of Monterey under 42 U.S.C. § 1983 based on its repeated denial of Del Monte Dunes’ request for a development permit. Each time Del Monte Dunes submitted a development request, the city of Monterey denied it and imposed more rigorous demands on Del Monte Dunes. Del Monte Dunes, 526 U.S. at 694, 119 S. Ct. at 1631. Eventually, Del Monte Dunes appealed these denials to the city council, and was again denied. Del Monte Dunes consequently filed a suit in federal district court alleging, among other things, that the denial amounted to an uncompensated taking under the Fifth Amendment. Del Monte Dunes, 526 U.S. at 698, 119 S. Ct. at 1633. The takings claims in that case were ultimately submitted to a jury, which returned a verdict in favor of Del Monte Dunes. Del Monte Dunes, 526 U.S. at 701, 119 S. Ct. at 1634. The question of whether the takings claim was properly submitted to the jury was later affirmed by the Ninth Circuit. The Ninth Circuit’s decision was subsequently appealed to the United States Supreme Court.
¶50 One of the issues considered by the Del Monte Dunes court was whether it was proper for the district court to submit the question of liability for takings to the jury, instead of having the issue decided by the district court without the aid of a jury. Del Monte Dunes, 526 U.S. at 707, 119 S. Ct. at 1637. Del Monte Dunes asserted that its right to a jury trial was conferred by the Seventh Amendment and 42 U.S.C. § 1983, and the United States Supreme Court agreed. Del Monte Dunes, 526 U.S. at 710-12, 119 S. Ct. at 1638-40. In its reasoning, the Del Monte Dunes court explained that because an action under § 1983 sounds primarily in tort, it was of a type of action cognizable under the common law, and thus a cause of action for which the Seventh Amendment provides a trial by jury. Del Monte Dunes, 526 U.S. at 709-10, 119 S. Ct. at 1638.
¶51 In reaching this conclusion, the United States Supreme Court *221 explicitly rebuffed an argument advanced by the city of Monterey that there was no common law right to a jury in eminent domain proceedings. In doing so, the Supreme Court highlighted the fact that the tortious nature of a § 1983 claim was wholly independent from the nature of underlying right giving rise to the § 1983 claim itself.
As Justice SC ALIA notes ... we have declined in other contexts to classify § 1983 actions based on the nature of the underlying right asserted, and the city provides no persuasive justification for adopting a different rule for Seventh Amendment purposes. Even when analyzed not as a § 1983 action simpliciter, however, but as a § 1983 action seeking redress for an uncompensated taking, Del Monte Dunes’ suit remains an action at law.
Although condemnation proceedings spring from the same Fifth Amendment right to compensation which, as incorporated by the Fourteenth Amendment, is applicable here, a condemnation action differs in important respects from a § 1983 action to redress an uncompensated taking.
Del Monte Dunes, 526 U.S. at 711-12, 119 S. Ct. at 1639 (citations omitted).
¶52 The Supreme Court explained this point further as follows:
Condemnation proceedings differ from the instant cause of action in another fundamental respect as well. When the government condemns property for public use, it provides the landowner a forum for seeking just compensation, as is required by the Constitution. If the condemnation proceedings do not, in fact, deny the landowner just compensation, the government’s actions are neither unconstitutional nor unlawful. Even when the government takes property without initiating condemnation proceedings, there is no constitutional violation unless or until the state fails to provide an adequate post deprivation remedy for the property loss. In this case, however, Del Monte Dunes was denied not only its property but also just compensation or even an adequate forum for seeking it. That is the gravamen of the § 1983 claim.
Del Monte Dunes, 526 U.S. at 714-15, 119 S. Ct. at 1641 (quotations and citations omitted).
¶53 In conclusion, the Supreme Court then clarified the scope of its holding with the following admonition:
We note the limitations of our Seventh Amendment holding. We do not address the jury’s role in an ordinary inverse condemnation suit. The action here was brought under § 1983, *222 a context in which the jury’s role in vindicating constitutional rights has long been recognized by the federal courts. A federal court, moreover, cannot entertain a takings claim under § 1983 unless or until the complaining landowner has been denied an adequate post deprivation remedy. Even the State of California, where this suit arose, now provides a facially adequate procedure for obtaining just compensation for temporary takings such as this one. Our decision is also circumscribed in its conceptual reach. The posture of the case does not present an appropriate occasion to define with precision the elements of a temporary regulatory takings claim; although the city objected to submitting issues of liability to the jury at all, it approved the instructions that were submitted to the jury and therefore has no basis to challenge them.
Del Monte Dunes, 526 U.S. at 721-22, 119 S. Ct. at 1644 (emphasis added).
¶54 The Del Monte Dunes Court thus took great pains to expressly limit its holding to actions brought under § 1983, and deliberately chose not to address the province of the jury in an ordinary inverse condemnation suit, or, by extension, a regulatory or categorical takings claim such as presented here.
¶55 In this connection, we also find that Chessman, Matter of C.L.A., and Sunburst Oil & Gas, upon which appellants rely, are not particularly helpful in deciding the issue presently before the Court. Those cases simply establish that a right to a jury trial exists for the class of cases which existed at the time the Montana Constitution was adopted. Chessman, 31 Mont, at 584-88, 79 P. at 256-57. “The rule in Montana is that our state constitution only guarantees the right to a jury trial in the class of cases in which the right was enjoyed when the constitution was adopted.” Matter of C.L.A., 211 Mont. at 396, 685 P.2d at 933. However, none of these cases demonstrate that Montanans enjoyed a right to jury trial on the issue of liability in an inverse condemnation, or categorical or regulatory takings case.
¶56 In this case, the District Court concluded that appellants would be entitled to a jury trial on the issue of damages if liability for the takings claim was established. The weight of authority tends to support the view that the right to jury trial in inverse condemnation suits-and, by extension, regulatory or categorical takings claims-is limited solely to the issue of damages. Hensler v. City of Glendale, 876 P.2d 1043, 1052 (Cal. 1994); Tibbs v. City of Sandpoint, 603 P.2d 1001, 1004 (Idaho 1979); Dept. of Agriculture and Consumer Servs. v. Mid- *223 Florida Growers, Inc., 521 So.2d 101, 104 (Fla. 1988); Deisher v. Kan. Dept. of Transp., 958 P.2d 656, 663 (Kan. 1998); Cumberland Farms, Inc. v. Town of Groton, 808 A.2d 1107, 1126-27 (Conn. 2002); Galvis v. State, Dept. of Transp., 167 P.3d 584, 589 (Wash. App. Div. 2 2007); See also New Port Largo, Inc. v. Monroe Co., 95 F.3d 1084, 1092 (11th Cir. 1996) (concluding specifically that there is no jury requirement for deciding whether a regulatory takings has occurred). Under these authorities, the District Court presumptively satisfied appellants’ constitutional right to a jury trial by providing a jury trial on the issue of damages.
¶57 Against this weight of authority, appellants have not cited a single case in which a court has held that the issue of liability in a categorical or regulatory takings case must he submitted to a jury. Although the question of whether a taking has occurred is in the nature of an “ad hoc, factual inquiry,” see Kafka, ¶ 69, it appears that both state and federal courts are in near universal agreement that whether the facts show that a regulatory or categorical taking has occurred is ultimately a question of law for the court. E.g., Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 932-33 (Tex. 1998); Chancellor Manor v. United States, 331 F.3d 891, 898 (Fed. Cir. 2003); Alevizos v. Metro. Airports Commn. of Minneapolis and St. Paul, 216 N.W.2d 651, 660-61 (Minn. 1974); Sieber v. State By and Through the Bd. of Forestry, 149 P.3d 1243, 1246 (Or. App. 2006); Vulcan Materials Co. v. City of Tehuacana, 369 F.3d 882, 886-87 (5th Cir. 2004); but see, Noghrey v. Town of Brookhaven, 852 N.Y.S.2d 220, 221 (N.Y. App. Div. 2 Dept. 2008) (submitting the question of whether a regulatory taking has occurred for a jury’s determination). In fact, the authority in this area strongly supports the District Court’s determination that “[wlhether a compensable taking has occurred is a question of law based on factual underpinnings.” Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (citing Maritrans, Inc. v. United States, 342 F.3d 1344, 1350-51 (Fed. Cir. 2003)); Moldon v. Co. of Clark, 188 P.3d 76, 79 (Nev. 2008); State v. Dunn, 888 N.E.2d 858, 861 (Ind. App. 2008); Scott v. Co. of Custer, 178 P.3d 1240, 1243 (Colo. App. 2007).
¶58 Under § 26-1-201, MCA, “all questions of law” are to be decided by the court, while questions of fact go to the jury pursuant to § 26-1-202, MCA. While takings claims arguably present “mixed questions of fact and law,” see Del Monte Dunes, 526 U.S. at 721, 119 S. Ct. at 1644, and while it may be that some cases in the regulatory or categorical takings arena present questions of fact which should be submitted to a jury, *224 the appellants here have not articulated what specific factual questions needed to be resolved by a jury in this case. In fact, it appears from the record that there were no factual disputes concerning the effects of 1-143 on appellants’ businesses and private property. Instead, the dispute centered on whether, as a legal matter, 1-143 constituted a regulatory or categorical taking.
¶59 In sum, we decline at this time to adopt a bright-line rule regarding the role of a jury in the context of categorical or regulatory takings claims. However, we conclude that the District Court did not err in this case by reserving for itself the question of whether the State was liable for an uncompensated taking. Given the primarily legal nature of takings inquiries, a jury determination should be required only in those cases in which the resolution of a factual dispute is necessary in order to determine whether a taking has occurred. Here, there appears to have been no such dispute. The appellants have not pointed to any factual question which should have been decided by a jury, nor for that matter do they complain that any of the District Court’s factual findings were in error. Instead, the gravamen of the appellants’ challenge is that the District Court made an incorrect legal determination that a regulatory or categorical taking had occurred. Under these particular circumstances, therefore, we hold that the District Court did not err in deciding the takings question without the presence of a jury.
¶60 Issue Three: Did the District Court err in concluding that Article II, Section 29 of the Montana Constitution does not provide any greater constitutional protection against the taking of private property than the Fifth Amendment to the U.S. Constitution, and that the same legal analysis applies to takings claims brought under the Fifth Amendment to the U.S. Constitution and Article II, Section 29 of the Montana Constitution?
¶61 In its Decision and Order of October 22, 2004, the District Court, citing to Western Energy Co. v. Genie Land Co., 227 Mont. 74, 737 P.2d 478 (1987), concluded that the same legal analysis, based on federal law under Penn Central, applies to takings claims whether brought under the U.S. or Montana Constitution. Appellants argue that the District Court erred in reaching this conclusion, and assert that Article II, Section 29 of the Montana Constitution provides greater protection than the Fifth Amendment, thus requiring a different analysis. This provision reads as follows:
Eminent domain. Private property shall not be taken or damaged for public use without just compensation to the full *225 extent of the loss having been first made to or paid into court for the owner. In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails.
Mont. Const., Art. II, § 29.
¶62 Appellants assert that the constitutional protection against “taking and damaging” of property is a fundamental right because it occurs in Article II of the Montana Constitution and, therefore, the State must show a compelling interest that is narrowly-tailored to impose the least restraints possible on their property interests. Appellants maintain that the State has failed to meet this burden because it failed to demonstrate that 1-143 substantially advanced any purported legitimate state interests such as protecting the tradition of fair chase hunting in Montana, or preventing the spread of CWD. See Opinion, ¶ 16 n. 2. Appellants assert that their position is supported by the plain language of Article II, Section 29, which protects against a “taking” or “damaging.” Therefore, the inquiry is whether Article II, Section 29 of the Montana Constitution affords greater, more expansive rights than does the Fifth Amendment to the U. S. Constitution, to the extent that a wholly separate regulatory takings analysis need be performed under the Montana Constitution.
¶63 As we noted in Kafka, we have generally looked to federal case law for guidance when considering takings claims brought under Article II, Section 29-a practice that is consistent with that of other states with similar or identical language in their state constitutions. See Kafka, ¶ 30. Appellants and the Dissent have seized upon the “damaging” language in Article II, Section 29 to argue for a sweeping new interpretation of this provision.
¶64 It is important to bear in mind that Article II, Section 29 protects against a “taking” and “damaging” of private property. We take this occasion to reaffirm the position taken in Kafka, that the protection against a “taking” of private property under Article II, Section 29 is coextensive with the protection given under the Fifth Amendment. Kafka, ¶¶ 30-31. In other words, a takings analysis based on federal law under Penn Central or Lucas is to be applied to takings claims whether brought under the U.S. or Montana Constitutions. This practice is in accord with the overwhelming majority of states that have similar or identical language in their state constitutions.
¶65 The question then becomes what type of protection, and accompanying analysis, is provided against a “damaging” of private property. This “or damaged” language was adopted verbatim from the *226 1889 Montana Constitution, and already has a well-established meaning. In Less v. City of Butte, 28 Mont. 27, 72 P. 140 (1903), the plaintiff sued the city for damages to his property occasioned by a change in- the grade and excavation of the street abutting his residence. As a result of the change, Less was confronted with a street graded and excavated to the depth of about seven feet below his home. Less claimed that his ability to use and enjoy his property had been significantly infringed, as had his access to the public street. The District Court awarded him $500, and the city appealed. In affirming the district court, this Court stated:
Constitutions which provide that “private property shall not be taken for public use without just compensation” are but declaratory of the common law, and contemplate the physical taking of property only. Under constitutions which provide that property shall not be “taken or damaged” it is universally held that “it is not necessary that there be any physical invasion of the individual’s property for public use to entitle him to compensation.” Root v. B. A. & P. Ry. Co., 20 Mont. 354, 51 Pac. 155, and cases cited. The owner of a city lot “has a kind of property in the public street for the purpose of giving to such land facilities of light, of air, and of access to the street.” Bohm v. Ry. Co., 129 N. Y. 576, 29 N. E. 802, 14 L.R.A. 344. “These easements are property, protected by the Constitution from being taken or damaged without just compensation.” Root v. B. A. & P. Ry. Co., supra. Moreover, it may frequently occur that “the consequential damage may impose a more serious loss upon the owner than a temporary spoliation or invasion of the property.” City of Atlanta v. Green, 67 Ga. 386.
Less, 28 Mont at 32, 72 P. at 141 (other citations omitted).
¶66 Subsequently, in Knight v. City of Billings, 197 Mont. 165, 642 P.2d 141 (1982), we were called upon to address plaintiffs’ complaints for inverse condemnation arising out of the improvements to 24th Street in Billings, which expanded the roadway to such an extent that the parties’ front yards were unusable and the noise and traffic horrific for the homes now virtually atop these new traffic lanes. Relying upon Less and the “or damaged” language of Article II, Section 29, we concluded that the private property interests of the plaintiffs had been interfered with to such an extent as to constitute a “taking” by inverse condemnation. We cautioned, however, that our holding was limited to the unique situation before us “where a physical taking across the street occurred.” Knight, 197 Mont. at 174, 642 P.2d at 146.
*227 ¶67 It thus appears that the “or damaged” language of the provision has been interpreted to apply to eminent domain proceedings, including inverse condemnation proceedings, where private property is taken or damaged for public use. In fact, during the debate over the 1972 Montana Constitution, the committee discussed this provision strictly in the context of eminent domain proceedings, using property taken for highway construction as the primary example in explaining what occurs when the offer by the government is, for example, too low or too high. See Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, pp. 1825-28.
¶68 Notably, the California state constitution contains the identical language as Article II, Section 29. California courts have, over the history of this provision, repeatedly been asked to expand the circumstances under which a private property owner may recover, with proponents contending that the “or damaged” language infers an intention to expand the scope of the provision outside the realm of eminent domain or public works. California courts have resisted this notion. As recently as 1995, in the case of Customer Co. v. City of Sacramento, 895 P.2d 900 (Cal. 1995), the Supreme Court of California, sitting en banc, rejected an attempt by a store owner to recover damages to his store occasioned by police action that was taken to enforce criminal laws. The court stated that “[t]he California Constitution of 1879 added the phrase ‘or damaged’ to the just compensation provision, but this change was not intended to expand the scope of the constitutional compensation provision beyond the ambit of eminent domain and public improvements.” Customer Co., 895 P.2d at 906 (citation omitted).
¶69 The point of the foregoing discussion is that the “or damaged” language of Article II, Section 29 is intended to apply to damage to real and private property occasioned by a taking of real property for public use. Neither the 1889 or 1972 Montana Constitutions evince any intent that it apply to regulatory takings or damages resulting therefrom. Moreover, the provision mandates that private property not be taken or damaged for public use without just compensation “having been first made to or paid into court for the owner.” This language obviously contemplates a condemnation of property by the State, and the recognition that the appropriation will cause determinable consequential damages to property owners affected thereby-damages which can be ascertained at the time of the taking. Simply put, the plain language of Article II, Section 29 does not suggest that the provision was intended to apply to the types of damages a regulatory *228 taking might arguably cause over time, after a regulation has taken its toll on a property owner. And, notably, neither the appellants nor the Dissent have cited a single case for the proposition that the “or damaging” language-which, incidentally, is present in roughly half of the state constitutions in this country, see Kafka, ¶ 30, n. 5-is intended to provide any greater protections in the regulatory taking context than does the Fifth Amendment to the U.S. Constitution, or that it applies to anything other than the consequential damages to the property of persons affected by a physical condemnation, or similar actions, initiated by the State.
¶70 The Dissent claims to have contradicted this proposition by citing to Wild Rice River Estates v. City of Fargo, 705 N.W.2d 850 (N.D. 2005), and Manufactured Housing Communities v. State, 13 P.3d 183 (Wash. 2000). However, an examination of these cases confirms the accuracy of the analysis and conclusions presented in this Opinion with respect to the meaning of the “or damaged” language in Article II, Section 29.
¶71 Manufactured Housing did involve a regulatory taking claim under the Washington State Constitution, employing an analysis which was distinct from that employed under the Fifth Amendment. Manufactured Housing, 13 P.3d at 187. However, this case is not supportive of the Dissent’s criticism. First, Manufactured Housing did not discuss the meaning of the “or damaged” language in the Washington State Constitution in the context of a regulatory takings claims. Thus, the significance of the Dissent’s citation to this case in the present context is unclear. Second, the Washington takings test has four distinct inquiries, which are grounded partly in federal and partly in state law. Manufactured Housing, 13 P.3d at 187. The Dissent, however, does not propose a distinct new test, or indeed, any analogous test. Rather, the Dissent simply argues that the federal tests should not apply, and that, instead, whenever there is any damage to private property by state action, compensation is required-whether the action was actually a taking or not. This amounts to a radically scaled-back Penn Central analysis: There need be no inquiry into the character of the government action or the reasonable investment-backed expectations of the claimant; rather, the only inquiry is whether there was any economic impact. Since the Dissent does not provide any guidance or bright line as to how much economic impact is enough to trigger a damaging-relying more on a “I know it when I see it” reflex (see Dissent, ¶ 167) — it is difficult to envision how the State could confidently afford to regulate anything *229 under such a regime. Arguably, any private property owner whose property was “damaged” by state action, whether in the form of restrictions, fees, or regulations, would be entitled to seek compensation therefore from the public fisc. As Justice Holmes noted in Pennsylvania Coal, “[gjovernment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.” Pennsylvania Coal Co. v. Mahon, 260 U.S. 412, 413, 43 S. Ct. 158, 159 (1922).
¶72 Moreover, while Wild Rice did discuss the “or damaged” language in the North Dakota State Constitution, neither Wild Rice itself, nor the cases upon which it relied, involved or discussed any regulatory takings claims. In Wild Rice, the North Dakota Supreme Court, in interpreting identical language in its state constitution stated the following:
Under N.D. Const, art. I, § 16, “[pjrivate property shall not be taken or damaged for public use without just compensation.” This Court has said our state constitutional provision is broader in some respects than its federal counterpart because the state provision “ ‘was intended to secure to owners, not only the possession of property, but also those rights which render possession valuable.’ ”
Wild Rice, 705 N.W.2d at 856 (quoting Grand Forks-Traill Water Users, Inc. v. Hjelle, 413 N.W.2d 344, 346 (N.D. 1987)).
¶73 Wild Rice relied upon Grand Forks, which in turned relied upon Donaldson v. City of Bismarck, 3 N.W.2d 808, 816 (N.D. 1942). Donaldson, in turn, relied upon King v. Stark County, 271 N.W. 771 (N.D. 1937). None of these cases applied the “or damaged” language in the context of a regulatory takings claim even remotely similar to the claim at bar. However, in King, the North Dakota Supreme Court specifically described the meaning of the “or damaged” language in its state constitution. Because the analysis is King is instructive regarding the Dissent’s contentions, we quote it at length:
When the Fifth Amendment to the Constitution of the United States was adopted, it was therein provided that private property could not be taken by the United States for public use without just compensation. And the earlier State Constitutions likewise so provided. But this guaranty was too narrow. It insured compensation only in those cases where property was taken. The severity of the rule and the injustice resulting from its application were recognized. In England, by act of Parliament, compensation has been allowed since 1845 for damage caused by the *230 construction of public works. In this country a wide diversity in the holdings of the courts of the several jurisdictions arose as to the meaning of the terms “taken” and “damaged.”
In 1870, the people of the State of Illinois amended their Constitution so that it provided that property should not be taken or damaged for public use without just compensation. And when the Constitution of the State of North Dakota was adopted this provision was inserted therein as section 14. Its history has been traced and its effect somewhat considered by this court heretofore. Nearly all of the State Constitutions now contain this provision. Under it the courts have uniformly held that there is liability not only for property taken, but also for consequential damages to property arising from the acts of the authorities in constructing public works. It is not necessary that there be a direct injury to the property itself in order to create this liability. It is sufficient to warrant a recovery if there be “some direct physical disturbance of a right, either public or private, which the plaintiff enjoys in connection with his property, and which gives to it an additional value, and that by reason of such disturbance he has sustained a special damage with respect to his property in excess of that sustained by the public generally.” And the diminution in value of property resulting from the acts complained of is special and peculiar within the meaning of the rule.
King, 271 N.W. at 773-74 (internal citations omitted).
¶74 The Dissent faults the Court for its “originalist” approach to Article II, Section 29, and for declining to adopt its construction of Article II, Section 29. Begging the question of why “originalist” is equivalent to “abhorrent,” (see Dissent, ¶¶ 173, 178), the fact is that virtually none of the legal rhetoric and argument posited by the Dissent here was presented by the appellants themselves-either in the District Court or before this Court. We routinely admonish parties that we do not consider a party’s change in legal argument, or new theories raised on appeal. State v. Rahn, 2008 MT 201, ¶ 22, 344 Mont. 110, ¶ 22, 187 P.3d 622, ¶ 22. Based on the issues actually raised and argued by the parties, and their failure to either effectively address our existing jurisprudence under Article II, Section 29, or argue for an expansion of existing law, we conclude that appellants have failed to establish that in the regulatory takings context, the “or damaged” language in Article II, Section 29 of the Montana Constitution affords more expansive rights than does the Fifth Amendment to the U.S. Constitution. Accordingly, we hold that the District Court did not err *231 in concluding that the takings analysis based on federal law under Penn Central applied to the regulatory takings claims brought against the State in this case.
¶75 Issue Four: Did the District Court err in denying appellants’ claim that 1-143 affected a categorical taking of their personal property?
¶76 In its Decision and Order of October 22, 2004, the District Court rejected the notion that appellants’ alternative livestock could be the object of a categorical takings claim under Lucas. A categorical taking occurs when a regulation or state action forces an owner to sacrifice all economically beneficial uses in the name of the common good, leaving the property “economically idle.” Kafka, ¶ 68. In Lucas, the United States Supreme Court seemed to imply that such categorical takings claims could apply only to land, and not to personal property:
Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner’s estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our “takings” jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State’s power over, the “bundle of rights” that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; “[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.” Pennsylvania Coal Co. v. Mahon, 260 U.S. [393], at 413, 43 S.Ct. [158], at 159. And in the case of personal property, by reason of the State’s traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property’s only economically productive use is sale or manufacture for sale). See Andrus v. Allard, 444 U.S. 51, 66-67, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (prohibition on sale of eagle feathers). In the case of land, however, we think the notion pressed by the Council that title is somehow held subject to the “implied limitation” that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of *232 our constitutional culture.
Lucas, 505 U.S. at 1027-28, 112 S. Ct. at 2899-2900 (footnotes omitted).
¶77 The District Court recognized that the Federal Circuit Court of Appeals has seemingly concluded that personal property could be the object of a categorical takings claim, see e.g., Maritrans, 342 F.3d at 1353-54, but chose to rely upon Lucas and concluded that private property, such as the alternative livestock in this case, could be the object of a regulatory, but not categorical, takings claim.
¶78 The appellants argue that the District Court erred in this conclusion as well. They argue that the portion of Lucas relied upon by the District Court is dicta, and further assert that no appellate court in the country has ever stretched this language in Lucas to preclude categorical takings of personal property. Instead, appellants urge this Court to rely upon Maritrans and conclude that their alternative livestock and related equipment can form the object of a categorical taking.
¶79 We agree with the appellants that some courts in the Federal Circuit seem to have entertained claims for categorical takings of personal property. In Maritrans, for instance, the Federal Circuit Court of Appeals considered whether a change in federal shipping regulations requiring oil carriers to use double hull tank barges caused a private company to sacrifice all economically beneficial uses of its single hull tank barges. Maritrans, 342 F.3d at 1354. Ultimately, the Federal Circuit Court of Appeals determined that no categorical taking of the ships had occurred, because the single hull ships still retained some beneficial use after the change in regulations. Maritrans, 342 F.3d at 1354-55.
¶80 Ultimately, we need not resolve the question of whether personal property, by itself, can form the object of a categorical takings claim.[3] Even if a categorical taking of appellants’ alternative livestock and related equipment was cognizable, we would nevertheless conclude that their categorical takings claims fail because the alternative livestock still have beneficial uses after the passage of 1-143, as the District Court concluded. The alternative livestock could be sold to out-of-state breeder operations or harvested for their meat and antlers. Granted, this may not be a profitable use of the alternative livestock, *233 but in order to make a claim for a categorical taking, appellants must show that 1-143 took all of the property’s economically beneficial use.[4] See Lucas, 505 U.S. at 1019 n. 8, 112 S. Ct. at 2895 n. 8. Indeed, as the Maritrans court itself noted,
Taking away a property’s most beneficial use does not by itself constitute a compensable taking. Andrus, 444 U.S. at 65-66, 100 S.Ct. 318. In Andrus, the Court stated that “[a]t least where an owner possesses a full “bundle’ of property rights, the destruction of one ‘strand’ of the bundle is not a taking.” Id. Only where Congress takes away every beneficial use does a categorical taking occur. Id.
Maritrans, 342 F.3d at 1354.
¶81 Accordingly, while we express no view on whether a Lucas categorical takings analysis could apply to takings of personal property, we hold in this case that appellants have failed to demonstrate that a categorical taking has occurred. Thus, we affirm the District Court.
¶82 Issue Five: Did the District Court err in concluding that 1-143 did not effect a regulatory taking of appellants’ private property?
¶83 In its Findings of Fact, Conclusions of Law, and Order dated May 2, 2005, the District Court denied appellants’ claims for regulatory takings under Penn Central. See Kafka, ¶¶ 66-72 (describing in detail the three-factor Penn Central regulatory takings analysis). Under the economic impact factor of this analysis, see Kafka, ¶ 72, the District Court made the following findings: (1) 1-143 prohibited the Wallaces’ fee-shooting business entirely, and eliminated the in-state market for the Buhmanns but did not prohibit the sales of their elk and Sweet Pro feed supplements to out-of-state buyers; (2) neither the Wallaces nor Buhmanns lost any significant value in their land or improvements; (3) both the Wallaces and Buhmanns lost substantial value in their elk herds; (4) both parties lost future expected profits; (5) both businesses had already been negatively affected by prior outbreaks of CWD, and that CWD was in fact one of the reasons why appellants could not profitably dispose of their alternative livestock to out-of-state markets; and (6) the Wallaces had already made a decision to get out of the Game Farm business prior to the passage of 1-143. Based on these *234 findings, the District Court concluded that the economic impact factor of the Penn Central regulatory takings analysis test favored the appellants.
¶84 With respect to the appellants’ “investment-backed expectations,” see Kafka, ¶ 72, the District Court found that, while the appellants knew that the Game Farm industry was highly controversial and heavily regulated, the appellants relied on the regulatory scheme in place when they entered the industry, and had invested significant sums of money on the expectation that the industry would never be regulated out of business. However, the District Court noted that under Penn Central, this investment-backed expectation is measured from an objective standpoint in terms of its reasonableness. The District Court, citing to Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed. Cir. 1993) and Allied-General Nuclear Servs. v. United States, 839 F.2d 1572 (Fed. Cir. 1998), see Kafka, ¶¶ 58-59 (discussing Mitchell Arms and Allied-General), noted that courts have held such investment-backed expectations to a very high standard when claimants are operating in highly regulated fields such as firearms exportation {Mitchell Arms) and plutonium recycling {Allied-General). Moreover, claimants operating in such fields should expect that the government can effectively regulate them out of business. In this regard, the District Court distinguished a case relied upon by appellants, Yancey v. United States, 915 F.2d 1534 (Fed. Cir. 1990), and held that this factor weighed in favor of the State and against finding a compensable taking.
¶85 Finally, with respect to the “character of the governmental action” prong, see Kafka, ¶¶ 70-71, the District Court concluded that this factor weighed in favor of the State because 1-143 was a valid exercise of the State’s police power to protect health and welfare, and that it affected an industry which was already subject to significant governmental regulation.[5]
¶86 Appellants maintain that the District Court erred in balancing the Penn Central factors and concluding that 1-143 did not effect a taking of their private property, in particular the alternative livestock and specialized Game Farm equipment. With respect to the economic impact factor, appellants agree with the conclusion that this amounted to a significant impact. However, appellants assert that the District *235 Court understated this impact because it evaluated the business as a whole, including the real estate (which had appreciated in spite of I-143), when appellants argue they did not claim a taking of their real property, but only of the business itself. They assert that a finding that 1-143 led to a fifty-percent reduction in their business is misleading because it includes in the computation the value of appreciated real estate. Instead, the Wallaces argue the impact should be measured in terms of the market value of the alternative livestock before 1-143 ($5.5 million dollars), versus its market value afterwards ($238,000). Similarly, the Wallaces argue that the true economic impact on their business by 1-143 was that it destroyed it. The Buhmanns maintain I-143 had a similar impact on their business as well.
¶87 With respect to the character of the governmental action factor, appellants argue that this factor also weighs in favor of a compensable taking because 1-143 does not address the problems associated with Game F arms (i. e., threat from C WD, or threatening the heritage of fair chase hunting) since it still permits the existence of Game Farms. In actuality, appellants argue, 1-143 is nothing more than a price control measure designed to protect the State’s competing enterprise of selling licenses for the shooting of wild, non-captive game. Finally, under the investment-backed expectations factor, appellants maintain that the District Court erred in relying upon Mitchell Arms andAllied-General, and that an analysis under Yancey supports their position. Appellants argue that they are not complaining that a particular regulation has made Game Farms more expensive, but that 1-143 directly prohibited the sale of a product in a manner contrary to their reasonable investment-backed expectations, because the State has never exercised any regulation over the fees charged for privately shooting alternative livestock. While the participants in the Game Farm industry might have reasonably expected that they would have to maintain extra fencing or increase testing of their livestock, they had no reason to anticipate state interference in the price they would be able to charge for fee-shooting. Thus, they argue, this factor should weigh in their favor.
¶88 As we noted at the outset of this Opinion, many of the arguments raised in the case at bar were previously addressed in Kafka. At this point, we will highlight the relevant portions of the Kafka decision insofar as they address appellants’ challenge to the District Court’s Penn Central analysis. As an initial matter, we note that because the appellants in this case, like those in Kafka, allege that a mix of property interests have been taken by 1-143, and do not allege that I- *236 143 took all of their property interests (i.e., appellants do not claim that 1-143 impacts the real property comprising their Game Farms at all) we will consider each of those business interests separately for purpose of a regulatory takings analysis. Kafka, ¶ 37.
¶89 Regarding the regulatory taking of intangible assets, i.e., appellants’ businesses in this case, we held in Kafka that businesses themselves cannot be taken unless the government physically condemns those businesses and runs them itself. See Kafka, ¶¶ 55-63. In Kafka we analyzed both the Mitchell Arms and Allied-General decisions in reaching this conclusion. Therefore, for the reasons set forth in Kafka, we hold that appellants’ businesses in this case were not taken by 1-143.
¶90 Accordingly, this leaves appellants’ elk and related Game Farm equipment. Under the economic impact prong of Penn Central, we agree with the District Court that 1-143 had a significant impact on the value of the Wallaces’ and Buhmanns’ alternative livestock. For purposes of this factor, the District Court found that the Wallaces had invested approximately $666,166 in elk purchases from 1997 through 1999. Before 1-143 the market value of the alternative livestock (approximately 850 head of elk) was roughly $5.5 million; after 1-143, the Wallaces liquidated the herd for $238,000.[6] The Wallaces’ Game Farm equipment (the specialized feeding trucks) were purchased for roughly $600,000 and sold for $150,000. The Buhmanns similarly had invested in the alternative livestock, and although the ban on fee-shooting did not directly prohibit them from breeding alternative livestock, it did cause a similar devaluation in their herd and also impacted their ability to sell Sweet Pro in Montana. Accordingly, the economic impact factor weighs in appellants’ favor.
¶91 However, with respect to the appellants’ investment-backed expectations and character of the governmental action factors, we agree with the District Court that these factors weigh against finding a compensable taking. As we noted in Kafka, while 1-143 impaired the profitable use of alternative livestock, it still allowed appellants every other use of their alternative livestock; thus, from the perspective of *237 regulatory takings law, the character of the governmental action embodied in 1-143 had a minimally intrusive effect on appellants’ bundle of property interests in the alternative livestock. See Kafka, ¶¶ 87-88. The same would be true with respect to the Wallaces’ specialized Game Farm equipment, as it could still be sold to out-of-state markets. Thus, while we disagree with the analysis employed by the District Court under this factor because it inquired into the purposes and propriety of 1-143 in a manner foreclosed by Lingle, (see Opinion, ¶ 80), we nonetheless agree with the District Court’s conclusion that this factor weighs against finding a compensable taking. See Wells Fargo Bank v. Talmage, 2007 MT 45, ¶ 23, 336 Mont. 125, ¶ 23, 152 P.3d 1275, ¶ 23 (stating that we will affirm a district court’s decision even if it reaches the right result for the wrong reason).
¶92 Similarly, under the investment-backed expectations prong, the regulative and speculative nature of the industry does play a significant role in determining whether a certain set of investment-backed expectations are “reasonable.” As we did in Kafka, we conclude that appellants in this case could not maintain a reasonable investment-backed expectation that Game Farms, and by extension fee-shooting, would always be legal in Montana. See Kafka, ¶¶ 89-93. In this connection, we agree with the District Court that Yancey does not alter the regulatory takings analysis in this case. In Yancey, Andrew and Elizabeth Yancey (Yanceys) owned and operated a turkey breeding operation in Rockingham County, Virginia. Yancey, 915 F.2d at 1536. In 1983, the Yanceys acquired a rafter of turkey breeder hens for purposes of selling the hatching eggs to customers in other states. In mid-October 1983, an outbreak of a pathogenic Avian Influenza occurred in Lancaster County, Pennsylvania, prompting the United States Department of Agriculture (USDA) to impose a quarantine in that state, which was later extended to Rockingham County, Virginia as well. The quarantine prohibited the Yanceys from the interstate shipping of live poultry, manure from the poultry, litter used by the poultry, as well as carcasses, eggs and certain equipment. Although the Yanceys’ flock was not affected by the influenza, they were unable to make productive use of the flock as they intended, and had to maintain the flock at a cost of $1,800 per week. They ultimately decided to slaughter the flock and sell it for meat, although the flock had not been raised to be economically viable for that purpose. They received $20,887 for the flock.
¶93 The Yanceys subsequently filed a $63,566 indemnity claim with *238 the USDA, representing the lost value from the flock as a result of the quarantine. The claim was denied and they filed a takings claim in the U.S. Claims Court under the Fifth Amendment. The claims court granted the Yanceys’ Fifth Amendment claim, and the government appealed. On appeal, the Federal Circuit Court of Appeals had to determine whether the effects of the quarantine constituted a compensable taking under the Fifth Amendment. Yancey, 915 F.2d at 1539.
¶94 The Yancey court applied the regulatory takings analysis from Penn Central. It noted that the claims court had found that the Yanceys’ flock had suffered a 77% devaluation as a result of the quarantine, because the healthy breeder flock would have been worth $91,616 if the quarantine had not been in place, and, further, that the Yanceys had no other alternative viable use for the flock other than slaughtering them so long as the quarantine remained in place. Yancey, 915 F.2d at 1539. Moreover, the court of appeals noted the lower court finding that the Yanceys only learned about the quarantine through the newspaper the day before it took effect and that they had investment-backed expectations to sell the hatching eggs to customers outside of Virginia-an action that was foreclosed by the immediate, unforeseen and disparate impact upon the Yanceys by the quarantine. Yancey, 915 F.2d at 1540.
¶95 In affirming the claims court’s decision, the Yancey court explicitly distinguished its case from Galloway Farms, Inc. v. United States, 834 F.2d 998 (Fed. Cir. 1987). In Galloway Farms, the Federal Circuit Court of Appeals held that a grain embargo imposed against the Soviet Union by President Jimmy Carter did not give rise to a compensable takings claim on behalf of grain farmers in the United States, in part because the grain embargo left open other markets. Galloway Farms, 834 F.2d at 1003. The Yancey court found its case distinguishable because the claims court had found that the Yanceys had no other choice but to sell their turkeys for substantially less than their value, while the grain farmers in Galloway Farms still had available markets. Yancey, 191 F.2d at 1541-42. The court concluded that “[w]hen adverse economic impact and unanticipated deprivation of an investment backed interest are suffered, as when the poultry quarantine forced the Yanceys to sell their turkey flock, compensation under the Fifth Amendment is appropriate.” Yancey, 191 F.2d at 1542.
¶96 We agree with the District Court that Yancey is distinguishable from the present case with respect to the investment-backed expectations factor of the Penn Central analysis. As a threshold *239 matter, we note that the investment-backed expectations are measured from an objective, not subjective, standpoint of reasonableness. See Cienega Gardens v. United States, 331 F.3d 1319, 1346 (Fed. Cir. 2003) (“This factor also incorporates an objective test-to support a claim for a regulatory taking, an investment-backed expectation must be ‘reasonable.’ ”). Moreover, the inquiry into the reasonableness of the investment backed expectation is unique to each case and cannot be reduced to any “set formula.” See Palazzolo v. R. I., 533 U.S. 606, 636, 121 S. Ct. 2448, 2467 (2001) (O’Connor, J., concurring).
¶97 In Yancey, the Court of Appeals was bound by factual determinations from the Court of Claims which supported the conclusion that the quarantine in that case was completely unexpected. The findings by the District Court in this case cut the other way, because the District Court noted that under an objective standard of reasonableness, the appellants could not maintain an expectation that the Game Farm industry would be permitted to continue indefinitely. The District Court specifically found that a previous outbreak of CWD on a Montana Game Farm in 1997 had already impeded the Wallaces’ sale of alternative livestock to out-of-state markets after the imposition of a moratorium on out-of-state sales, and that their ability to sell the Big Velvet Ranch before the passage of 1-143 was negatively impacted from the previous CWD outbreaks. Additionally, the appellants were aware of the highly controversial nature of Game Farms and the fact that CWD presented significant risks making it a highly regulated industry.
¶98 With respect to the “reasonableness” of investment-backed expectations, the analogy between the Game Farm industry and other industries such as the importation of firearms discussed in Mitchell Arms, or the plutonium recycling industry discussed in Allied-General, is actually quite apt, because at the time these Game Farms were in existence, CWD posed a very serious threat to the native elk and deer populations within Montana, given that it was impossible to completely prevent alternative livestock from escaping the confines of a Game Farm. Moreover, there was no live test for CWD which is a permanent and irreversible disease. Hagener, ¶ 25.[7] Moreover, the District Court explicitly found that the exact incubation period and *240 means of transmitting CWD are not completely understood. In fact, it was primarily the grave threat posed by CWD which required the extensive regulation of the Game Farm industry in Montana. See Kafka, ¶ 8. It was against the backdrop of these inherent dangers that appellants were operating. Moreover, these dangers were publicly known and very controversial among many members of the public. Thus, unlike Yancey, where the poultry producers would have no reason to expect that a healthy flock of turkeys would have to be suddenly destroyed, those in the Game Farm industry knew that their alternative livestock carried with them an inherent danger of spreading CWD which could never be eliminated and which could prove uncontrollable if it made its way into the genetic make-up of the native wildlife populations. These facts, together with the highly regulated nature of the industry, must be considered when evaluating the “reasonableness” of appellants’ investment-backed expectations.
¶99 As we noted in Kafka, the Penn Central analysis calls for a balancing of the factors in order “ ‘to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.’ ” Kafka, ¶ 94 (quoting Lingle, 544 U.S. at 539, 125 S. Ct. at 2082). After weighing the factors in the case, we conclude that the economic impact factor weighs in favor of a compensable taking, while the character of the governmental action and reasonable investment-backed expectations factors do not. Accordingly, for the same reasons we denied similar claims in Kafka, we conclude the District Court did not err in denying appellants’ regulatory takings claims. See Kafka, ¶ 94.
CONCLUSION
¶100 Based upon the foregoing, we affirm the District Court.
CHIEF JUSTICE GRAY, JUSTICE LEAPHART and DISTRICT COURT JUDGE CHRISTOPHER, sitting for JUSTICE WARNER.

 At the close of appellants’ case-in-chief, the District Court granted the State’s motion to dismiss the § 1983 claim for failure to proof. Appellants did not object at the time, and do not challenge the dismissal of this claim on appeal.

 In this connection, we note that much of the analysis by the District Court and argument by the parties during the bench trial, focused on the purposes and objectives of 1-143, and whether it accomplished the goals of preventing outbreaks of CWD, preserving Montana’s “fair chase” hunting heritage, and preventing the privatization or commercialization of wildlife. However, as we observed in Kafka, recent United States Supreme Court jurisprudence has foreclosed an inquiry into the efficacy or purposes of a regulatory change (which are best considered as “due process” concerns) in the realm of regulatory or categorical takings analysis. See Kafka, ¶¶ 70-71 (discussing Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 125 S. Ct. 2074 (2005)). In other words, for purposes of the takings analysis in this case, it is immaterial whether or not 1-143 is effective in achieving any of the objectives or concerns it was designed to address.

 However, we do note that, contrary to appellants’ claims, some courts have interpreted Lucas in just such a manner. See, e.g., Hawkeye Commodity Promotions, Inc. v. Vilsack, 486 F.3d 430, 441 (8th Cir. 2007) (holding that Lucas categorical taking rule “protects real property only”).

 The reasons why the out-of-state markets were not profitable are beyond the scope of a categorical takings analysis. Indeed, in this case it would be difficult, if not impossible, to isolate just how much of the profitability of sale to out-of-state markets was affected by previous outbreaks of CWD on Game Farms in Montana, or on other market forces unrelated to the passage of 1-143.

 The District Court’s analysis under this factor, as it inquired to a certain extent into the purpose and propriety of 1-143, would no longer be valid under Lingle. See ¶ 16 n. 2.

 In this case, appellants did not provide any expert testimony concerning the change in the fair market value of the alternative livestock before and after 1-143. In Kafka, expert testimony was in fact presented showing that alternative livestock before 1-143 was worth $5,000 per head, while after 1-143 the livestock was worth $500 per head. This represented a roughly 90% devaluation. Kafka, ¶ 84. Here, no comparable testimony was provided. However, given the size of the Wallaces’ herd (850 elk) and utilizing the evaluation figures employed in Kafka, the Wallaces’ herd lost approximately 95% of its fair market value.

 As we noted in Hagener, it was limitations on testing for CWD which led the legislature to impose a moratorium on new Game Farms in 2000. This moratorium was a response to an outbreak of CWD on a Phillipsburg Game Farm in 1999. Hagener, ¶ 25.